531 So.2d 598 (1988)
Judy Lane HOUSTON
v.
STATE of Mississippi.
No. DP-78.
Supreme Court of Mississippi.
September 7, 1988.
*599 Jack R. Jones, III, Taylor, Jones, Alexander & Seale, Southaven, Robert M. Ryan, Senatobia, Clive A. Stafford Smith, Atlanta, Ga., for appellant.
Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Donald G. Barlow and Felicia C. Adams, Sp. Asst. Attys. Gen., Jackson, Robert L. Williams, Dist. Atty., Water Valley, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This shocking case of a mother's inhumanity to her child presents in sharp focus the dual ends of our criminal justice system: deciding whether the accused committed the crime but at once deciding the point fairly. The fairness point draws its importance from the dispute at trial whether the defendant mother was guilty of capital murder or some lesser homicide, and, assuming guilt of capital murder, whether at sentencing she should be put to death or imprisoned for life.
The trial we examine today  and with the benefit of twenty-twenty hindsight (for that is the sight the law requires that we bring to bear on appellate review)  fails the fairness test three-fold. The prosecution was allowed to present seven years' evidence of this mother's sporadic abuse of her child, evidence quite inflammatory but not fairly related to any issue in the case. To make matters worse, the prior abuse evidence was presented in pure hearsay form. Finally, in the face of a defense discovery violation, the trial judge's preclusion of practically the entire case for the defendant at sentencing was a bit heavy handed. We reverse and remand for a new trial.

II.

A.
Our courts frequently encounter painful examples of tragic and premature endings to the lives of the young. That we have seen such before in no way deadens the sense of shock we experience today.
At the time of her death fourteen-year-old Paula Susanne Houston was a petite, quiet teenager, poised to graduate from the ninth grade at the Pope School. Paula was a straight-A student, scheduled to receive academic excellence awards in English, science and history. But Paula never got her awards. For reasons we may only partially know, Paula's life was brutally taken  by her mother.
Many of the facts are found in the voluntary confession of Judy Lane Houston, Paula's mother, as given to law enforcement officers the day after the murder.
Apparently, on Sunday, June 2, 1985, Houston had discovered a letter from Paula to a girlfriend in which Paula had counseled *600 her friend to be sure before she did "it" with her boyfriend. The letter went on to describe Paula's dreamy state over an unidentified boy. Houston and her husband, Larry Houston, got into a heated argument about Houston reading Paula's letter, but when Houston asked her husband to punish Paula he "dusted her britches" with a belt. Larry Houston then stormed off to work sometime prior to 10:00 p.m. and did not get home until sometime after 7:45 a.m. on Monday, June 3, his shift at his place of employment in Grenada having ended at 7:00 a.m.
In her confession, Houston said that when she got up at 6:30 a.m. Paula was already up and dressed. Houston claimed that Paula refused to go to school in spite of the fact that final exams were being given. Instead, Paula went to work washing her clothes and feeding and watering the animals, while Houston got the other two girls ready for school. Houston claims that after the girls got on the bus for school, Paula came in and cursed her and accused her of marital infidelity.
... Paula started the fight by acting like she was going to scratch me. She had never put her glasses on. She had a wild look on her face, that's when I grabbed her right arm and gave her a flip. She fell and hit the floor. She started to call me a slut. When she tried to get up, I slapped her on the side of her head. She tried to get up a second time. She was down on her hands and feet (all fours). There was a pink macrame belt lying on Paula's bed. I reached over and grabbed the belt and dropped it over the front of her head ... I held the belt around her neck for a short time and she just collapsed.
After this, Houston says she went outside, lay down and cried, then came back in and tried to revive Paula by shaking her, calling her name and pouring water on her, but to no avail.
As though nothing had happened, Houston called the Charleston Clinic and made an appointment for herself at 8:30 that morning. She then took Paula's outer clothes off and put Paula's body in the trunk of her car. She went to the clinic; left there around 10-10:30 a.m.; drove to a dump on the banks of the Yocona River in south Panola County; took Paula's underpants and bra off and threw Paula's body off the bank. When she got home, Larry Houston was there and she asked him if his insurance would cover her medical bills. Larry Houston asked where Paula was. Houston suggested that she may have run off with a boy. Larry Houston told her to check with the school, and later to go to town to get her prescriptions filled and report Paula missing.

B.
On June 14, 1985, Judy Lane Houston was formally charged with capital murder in an indictment returned by the Panola County Grand Jury. The indictment alleged more specifically that on or before June 3, 1985, Houston had murdered her fourteen-year-old daughter, Paula Susanne Houston, while engaged in the crime of felonious child abuse and battery. See Miss. Code Ann. §§ 97-3-19(2)(f) and 97-5-39(2) (Supp. 1987).
After change of venue to Desoto County, the case was called for trial on December 2, 1985. A five day trial ensued, the jury in the end returning a verdict of guilty as charged. On December 7, 1985, at the conclusion of the penalty phase, the jury determined that Houston should suffer the punishment of death. From this conviction and sentence, Houston appeals.

III.
Houston argues that the Circuit Court erred in overruling her objections to the jury's receiving the statements she had given law enforcement authorities. More specifically, she claims violations of her rights secured by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States. We further consider her claim under Miss. Const. Art. 3, § 26 (1890).
Three inculpatory statements are at issue here: the June 4, 1985, confession; a June 5 statement; and, a June 7 statement. During the suppression hearing, Houston *601 and the prosecution's witnesses testified to identical facts in relation to the last two statements.
On June 5, 1985, while Houston was in jail, Panola County Dispatcher/Deputy, Dorothy Ann Collins, and Deputy Sheriff Joe Cosby had a fifteen minute interview with Houston. Collins read Houston her rights and Houston signed a waiver of rights form. Houston understood and freely and voluntarily waived her rights. She was not coerced and no force or threats were used. She did not ask for a lawyer or for the questioning to end. Houston told Collins and Cosby that she had strangled Paula with a pink macrame belt, but that she did not know where the belt was.
On June 7, 1985, Houston was interviewed by Sheriff David M. Bryan and Deputy Cosby. She was orally informed of her rights, which she understood and freely and voluntarily waived. Again, Houston was not coerced. She did not request a lawyer. She told them that she had had a dream and that all she could remember was seeing the belt around Paula's neck.
Between 4:00 and 5:00 p.m. on June 4, 1985, Panola County Sheriff Bryan and Jay Clark, a criminal investigator with the State Highway Patrol, took Houston from her home to the Panola County Courthouse for questioning. Houston testified that she was not advised of her rights, but she gave the sheriff an exculpatory statement anyway. Houston claims that at this point she was taken back to the Sheriff's car where he told her that he knew she had done it, that someone had seen her dumping the body, and that it would be easier on her if she told the truth. Bryan and Clark testified that this did not happen.
Everyone agrees that she (then or initially) was Mirandized and that she signed a waiver of her rights. Bryan and Clark stated that she said she understood her rights, that she was alert and calm, that she was not coerced or threatened, and that she never requested a lawyer. Houston stated that she did not really understand all of her rights at that time, that she was "upset, nervous, numb, whatever. Didn't really know what was going on" and that she "thought" she requested a lawyer. Sheriff Bryan wrote down Houston's seven-page confession, at the end of which Houston signed each page. She was then formally charged with the murder and put in jail. The Circuit Court held that all of these statements were admissible.
Houston argues that these statements given to law enforcement officials should have been suppressed because her right to counsel had attached and was violated. She cites Page v. State, 495 So.2d 436 (Miss. 1986); Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); and, Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986).
Although Houston's right to counsel had attached at the time she gave her confessions, Nicholson v. State, 523 So.2d 68, 76-77 (Miss. 1988), the evidence convincingly establishes that Houston knowingly, intelligently and voluntarily waived her rights, including her right to counsel. Page v. State, 495 So.2d 436, 440 (Miss. 1986); Jordan v. State, 464 So.2d 475, 480 (Miss. 1985). She has been denied no right secured to her by federal or state constitution. The Circuit Court's holding in this regard is beyond our authority to disturb. Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986); Gavin v. State, 473 So.2d 952, 955 (Miss. 1985); Neal v. State, 451 So.2d 743, 753 (Miss. 1984).

IV.
Houston argues that physical evidence taken from her home and car should have been suppressed because the law enforcement officials never received competent consent to search. In this she claims violation of rights secured to her by the Fourth and Fourteenth Amendments to the Constitution of the United States. In support of her position, Houston points to a portion of the suppression hearing, during which the Circuit Court sustained a defense objection to the sheriff's supposition that the Houston home was owned jointly by Houston and her husband, Larry Houston. Houston cites Foti Construction Co. v. Donovan, 786 F.2d 714, 717 (6th Cir.1986).
*602 At the conclusion of a lengthy suppression hearing, the Circuit Court held admissible any evidence seized from Houston's car and the Houstons' home, as such was the product of a valid consent search. The evidence established that Larry Houston was in a position to give his consent to the searches and that he did so voluntarily and with no coercion.
Larry Houston was advised of his rights and freely and voluntarily signed a consent to search form. Houston, herself, on cross-examination, said that her car was registered in her husband's name and that she and her husband shared their home and were buying, rather than renting, it. The fact that the defense objection to the sheriff's "supposition" that the home was jointly owned was sustained is irrelevant because there was other evidence of joint control.
In Shaw v. State, 476 So.2d 22, 24 (Miss. 1985), quoting Brown v. State, 358 So.2d 1004, 1005 (Miss. 1978), we said:
"Consent to search voluntarily given without coercion may be given by a third party who possessed common authority, mutual use and joint control over property not in the exclusive control or possession of the defendant and where the defendant had no reasonable expectation of privacy.
Haralson v. State, 318 So.2d 891 (Miss. 1975); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).
As an aside, the record indicates that none of the evidence seized from the car was entered into evidence at trial and the only evidence seized from the house entered into evidence at trial was a note written from Houston to her husband on the morning of the crime (turned over by Larry Houston), notes of Paula's retrieved from Paula's bedroom, and photographs of the exterior of the house, the hallway, the bathroom, the laundry room and Paula's bedroom.
The assignment of error is denied.

V.

A.
Houston next complains of the Circuit Court's refusal to sustain her objection to the prosecution's introduction of evidence that she physically abused Paula prior to the fateful June 3, 1985.[1] We are concerned with some nine arguably isolated occasions of abuse, as long ago as the fall of 1977 and most recently in the spring of 1984, still some fifteen months before the occasion in question. We consider the point on relevancy grounds. We are also presented hearsay and confrontation clause objections. Beyond that there is the problem of conducting a series of mini-trials  trials within a trial  to establish Houston's culpability on each prior occasion.

B.
Prior to trial, Houston filed a motion in limine seeking to preclude use of this evidence. *603 At the hearing on the motion outside the presence of the jury, Paula's school principal, nurse, guidance counselor, and bus driver, as well as one of Paula's friends, testified. The prosecution also proffered the testimony of two of Paula's teachers. The evidence of this history of abuse is set out below.
In the fall of 1977, when Paula was seven years old and in the second grade, her teacher noticed her severely bruised and swollen eye and asked what happened. At first, Paula told him she had been jumping in bed and hit her eye on the bedpost. Paula then told him that this is what her mother told her to say, but that, in reality, her mother had hit her with a belt buckle. Paula then saw the school guidance counselor and first told her the bedpost story and then that her mother had hit her with a broomstick. The counselor called the Welfare Department. The counselor testified that a welfare worker spoke to Houston and that Houston admitted she had hit Paula in anger, but that it would not happen again. All of this evidence, except the double hearsay admission, was presented to the jury.
In the fall of 1979, when Paula was nine years old and in the fourth grade, the counselor saw Paula in relation to a report from one of the teachers that Paula had said she had received "100 licks". The counselor testified that Paula was examined and that there was no physical indication that she had received a whipping, but that this did not mean that she had not. The counselor saw Paula a second time in the fall of 1979 where welts and bruises to Paula's eye and bruises across her back, from her shoulders to her buttocks, were visible. The counselor's questions yielded Paula's report that her mother had beaten her with a brush on the face and with a belt on her back.
The counselor and school nurse testified to abrasions they remembered seeing in September, 1981. Paula told them that these cuts were the result of a bicycle accident. The nurse testified that in her opinion these abrasions were the result of a bicycle accident. The counselor equivocated.
On October 13, 1980, when Paula was ten years old and in the fifth grade, the school nurse sent a letter home to Paula's mother explaining that Paula needed glasses. On October 14, 1980, Paula's teacher noticed that she was having difficulty walking and moving around and reported this to the principal. The school nurse and teacher examined Paula and questioned her. Her left cheek and arm were bruised. She also had extensive bruises on her waist, buttocks, and outer thigh. Paula told these school officials that her mother had whipped her with a belt. The school nurse and a welfare worker contacted Houston the following day, on October 15, 1980. The nurse testified that Houston told them that Paula's bruises were from a fall off the swing set; that she had not spanked Paula in six months, but that when she did she only used her hand; and, that Paula was a spoiled and stubborn child because she had been kept by her grandmother for seven years. The nurse testified that the welfare worker suggested to Houston that the whole family should go for counseling, and that Houston had replied that her husband would not do it, but after persistent recommendations from the welfare worker, Houston said that they should send a letter recommending counseling.
On the morning of October 27, 1983, when Paula was thirteen years old and in the eighth grade, she approached the principal and told him that she was tired of the verbal and physical harassment and wanted to leave home. Her left arm was severely swollen and bruised and Paula reported that her mother had hit her with the buckle end of a belt. She also had a bruise on her right outer thigh. Houston was contacted and apparently told the witnesses that something must have happened to Paula at school because she was all right when she left home that morning. The nurse testified that the bruises were less than twelve hours old and could have been formed that morning or the night before. The nurse also testified that on October 27, 1983, Paula told her that the situation was not as bad as it used to be, that she still got some *604 whippings from her mother, but that she may have deserved them. Paula apparently went on to say that what was bothering her most was the constant verbal harassment. The nurse and the principal testified that her mother called her vile and abusive names. These witnesses also testified that by the end of the day Paula had grown more frightened but ultimately decided to return to her home.
The bus driver testified that at some point during Paula's elementary school years she observed a red scratch down the side of Paula's face. When the bus driver asked Paula what had happened, Paula told her that her mother had hit her with a hair brush. Again, later during the elementary school years, as Paula was getting into the bus, another child told Paula to "show [the bus driver] what your mama did." Paula apparently pulled up her dress and showed the bus driver her black and blue back end. Finally, the bus driver testified that, during the last year of her life, Paula boarded her bus at least twice a week in tears.
One of Paula's girlfriends testified that she remembered numerous times from the seventh grade on, that Paula told her that Houston would hit her with back and hair brushes, packs of pencils, and a belt. Paula's friend also identified a letter that Paula had written in the eighth grade to her and another friend. The letter included the following:
You don't believe moma says those things about you and that she beats me. My eye on the left is so much worse than the other one because moma hit me with a backbrush. I have cuts on my right arm because she sailed me through a barbed wire fence. Don't have pity on me. I don't want anything but to be left alone. P.S. I hope you all are very happy that I am going through Hell!

Finally, the principal testified that in March, 1984, Paula told him that things were not much better at home. He also testified that later in the spring of 1984, Houston called him complaining about a physical education teacher. He stated that Houston was loud and abusive and shouting obscenities. When he had had enough, he told Houston that he was not going to listen anymore, and that, if she did not stop abusing her child, he would contact legal authorities. The principal testified that, at this point, Houston hung up.
The record reflects no evidence of physical abuse in the fifteen-odd months between March of 1984 and June 3, 1985. Importantly, no witness testified that he or she had ever seen Houston whipping or abusing Paula. Larry Houston was never contacted regarding any of the incidents. In all but one instance, Paula was the only one who substantiated the fact that it was her mother who had hit her. Paula's substantiation was presented to the jury in pure hearsay form.
At the conclusion of the hearing the defense argued that the accounts were inadmissible because they were remote, because the only substantiation was through hearsay, because they suggested crimes or other bad acts for which Houston had not been convicted and which were beyond the scope of the present indictment, and that any claim that Houston admitted her crimes by hanging up on the principal was wholly without merit. The prosecution argued that remoteness went to the weight of the evidence, not to its admissibility, and that Paula's statements were exceptions to the hearsay rule as, present sense impressions; excited utterances; a then existing mental, emotional or physical condition; statements for purposes of medical diagnosis or treatment; or because they were generally trustworthy.
The Circuit Court overruled the defense motion,[2] noting that the proof that Houston had committed the prior acts was quite strong and cited Johnson v. State, 475 So.2d 1136 (Miss. 1985). The Circuit Court, agreeing with the prosecution, ruled that *605 remoteness would go to the weight of the evidence and not its admissibility. The jury was allowed to hear all of this evidence, apart from the double hearsay exception noted in V B above. The Court instructed the jury, however, that it should consider the prior abuse evidence solely on the issue of intent.[3]

C.

1.
There is first the question of relevancy. Even before the advent of Rule 401, Miss.R.Ev., evidence was admissible on relevancy grounds in a civil or criminal action only if it had a tendency to make the existence of a fact of consequence more probable or less probable than it would be without the evidence. Collins v. State, 513 So.2d 877, 878 (Miss. 1987); Mississippi State Highway Commission v. Dixie Contractors, Inc., 375 So.2d 1202, 1205 (Miss. 1979). Determination of what is a fact of consequence is a function of the issues in the case.
In a criminal case, our first resort is to the indictment and the crime there charged. The present indictment charges that Houston "on or before June 3, 1985," committed the capital murder of Paula Houston. The particular variety of capital murder identified in the indictment is killing in the course of child abuse. See Miss. Code Ann. § 97-3-19(2)(f) (Supp. 1987) which is to be read in conjunction with our felonious child abuse statute, Miss. Code Ann. § 97-5-39(2) (Supp. 1987). See generally Faraga v. State, 514 So.2d 295, 301-03 (Miss. 1987). Evidence would be relevant if it could reasonably be said to influence resolution of any fact of consequence in determining whether Houston murdered Paula in the course of feloniously abusing her.
The indictment uses the familiar legalese "on or before June 3, 1985". While this language might fairly be read to have informed Houston that evidence of abuse on the day before was fair game, see Rule 2.05(5), Miss.Unif.Crim.R.Cir.Ct.Prac. (1979), it is not so elastic as to stretch back to 1977. To be sure, the indictment could have been drawn so as to charge a long series of acts of felonious child abuse, as that offense is one that may be episodic if not continuing in nature.[4] The indictment, however, was not so drawn and our relevancy inquiry is thus more limited.
Prior to Rule 404(b), Miss.R.Ev., our law recognized certain exceptions to the general rule that relevancy in a criminal prosecution was governed  and limited  by the indictment. These exceptions were summarized in Cardwell v. State, 461 So.2d 754 (Miss. 1984).
Evidence of other crimes [or other bad acts] ... is admissible to prove motive, intent, the absence of accident or mistake, a common scheme or plan ..., or the identity of the person charged... .
461 So.2d at 759. Relevancy in this context has been often discussed. Brooks v. State, 242 So.2d 865 (Miss. 1971) stated
the acid test is its [the disputed evidence] logical relevancy to the particular excepted purpose or purposes.
242 So.2d at 869; see also Wansley v. State, 339 So.2d 989, 990 (Miss. 1976); and Engbrecht v. State, 268 So.2d 507, 510 (Miss. 1972). This "acid test" is but another *606 way of putting the primary relevancy point made above from the Collins and Dixie Contractors cases. As indicated above, the Circuit Court held the prior abuse evidence relevant on the issue Houston's "intent" and "malice aforethought".
We have a series of pre-Rules cases superficially recognizing the relevancy  and hence the admissibility  of some types of prior abuse evidence  although none is entirely clear whether the Court accepted primary relevancy or other bad acts relevancy, nor, if the latter, which of the specific exceptions such evidence is relevant to. Each suggests, however, that such evidence becomes relevant in rebuttal after the defendant has sought to show or infer that the injuries sustained by the child were accidental or the result of an isolated incident. We have no case suggesting that evidence of prior abuse is necessary in order for the prosecution to carry the day on proving the offense as it has been defined in Section 97-5-39(2). Indeed, Faraga is precisely to the contrary.
A closer look at these cases is merited, as the point is of some consequence, for "intent" is one of those issues that overlaps primary relevancy [now governed by Rule 401] and other bad acts relevancy [now Rule 404(b)]. Aldridge v. State, 398 So.2d 1308 (Miss. 1981) is one of our early cases wherein the prosecution sought to proceed under the theory of the "battered child syndrome". 398 So.2d at 1309. The victim was the defendants' infant daughter, whose age is not given. Over defense objections this Court held the evidence "indicating a series of injuries inflicted upon the child" relevant on grounds that it
supports an ongoing, continuing and purposeful course of criminal abuse of the child and tends to negate the idea that the injuries were the result of a fall or other isolated accident. 398 So.2d at 1312.
Two points need to be remembered. First, felonious child abuse may be charged and proved as an episodic series of occurrences, although, as Faraga makes clear, it need not be. Where the indictment charges a series or continuing course of abuse of a child, prior instances of abuse are arguably by definition not "prior". Here, however, the indictment charges only that Judy Houston engaged in felonious child abuse of her daughter on or before June 3, 1985. This is quite sufficient to charge the underlying felony for capital murder purposes.[5] Proof, for example, of Houston's abuse of her daughter in the fall of 1977 has no logical relevance to whether she abused her daughter on June 3, 1985. Such proof in no way influences resolution of a fact of consequence on the question whether on June 3, 1985, Houston committed the felonious abuse component of the capital murder charge laid in the indictment.
The Circuit Court admitted the prior abuse evidence, however, solely on the question of Houston's "intent" or "malice aforethought". This brings us to the other condition recognized in Aldridge: that the evidence of prior abuse may be received "to negate the idea that the injuries were the result of a fall or other isolated incident." Here the word "negate" is the key. It suggests that the evidence is relevant if there has in some manner been a prior effort by the defendant to convince the court and jury that the child's injuries were the result of a fall or other isolated accident. Here they find nothing of the sort. At the time the prior abuse evidence was received, Houston had offered no evidence *607 whatsoever. In fact, Houston never offered any evidence at the guilt phase of the trial, much less evidence attempting to show that the injuries Paula had received on June 3, 1985, were the result of a fall or isolated accident. Perhaps if defense counsel had indicated in opening statement that Houston would attempt to prove such "isolated accident," we might have a different matter, but such is not the case here as defense counsel made no opening statement.
The only thing before the Court which might conceivably be taken as forming the predicate is Houston's confession. But Houston did not put this confession in evidence. Indeed, she objected to it. The prosecution may not build a strawman and then knock it down. The prosecution cannot place Houston's confession before the jury and then claim this has sufficed to lay the predicate for evidence of eight years of prior abuse which is not logically relevant to the charge in the indictment.
The Aldridge test has been carried forward in our subsequent cases. Shelton v. State, 445 So.2d 844, 848 (Miss. 1984) quotes the language from Aldridge referred to above with approval. Shelton concerned a course of continuing abuse over approximately six months. The Court held it was relevant in Shelton
Where, as here, it was needed to negate the testimony of appellant's wife that the injuries were the result of a fall or other isolated accident... . The evidence was relevant to negate the testimony of the wife that the child's leg was broken as the result of a fall or other isolated incident, ... .
445 So.2d at 848. Here Houston offered no such testimony for the prosecution to rebut.
The Aldridge rule has been reaffirmed in Cardwell v. State, 461 So.2d 754, 759-60 (Miss. 1984); and Johnson v. State, 475 So.2d 1136, 1143 (Miss. 1985).[6] Those two cases cited "with approval the notion that evidence of prior acts of abuse is admissible to negate the idea that the injuries resulted from an isolated accident." They add a further pre-condition to admissibility of the evidence, that is, proof that the defendant committed the prior offense.[7]Cardwell, 461 So.2d at 760; Johnson, 475 So.2d at 1143.
Cardwell and Johnson also suggest relevancy  and, hence, admissibility  to establish criminal intent or malice aforethought in the context of a prosecution for child abuse that results in the death of the child. In today's case, the Circuit Court acknowledged the authority of Cardwell and Johnson when it admitted the evidence on this theory. The Court instructed the jury that it could consider the evidence solely on the issue of intent. But if prior abuse evidence is to have relevancy on that ground, it must be upon the premise that one who does an act once or twice is more likely to repeat the act than one who has never done it. If intent is the issue upon which the prior abuse evidence is relevant, it follows that the prior abuse evidence must reflect an intent to abuse  an intent of the same felonious nature as is involved in the present prosecution. But this begs the question, for nothing in the prior abuse evidence reflects upon intent. Nothing offered shows any pattern of behavior, differing from the spontaneous loss-of-control, fly-off-the-handle theory of Houston's confession  only that the same thing may have happened on a number of occasions over the years.
The problem may be stated more generally. Before evidence may be received under *608 the other bad acts exception to the primary relevancy rule, the proponent must articulate precisely the evidential hypothesis by which the consequential fact, i.e., Houston's criminal intent, may be inferred from the proffered evidence, i.e., proof of prior abuse. See 2 Weinstein's Evidence § 404[08], p. 404-58 (1986). The prosecution has not offered any such hypothesis, nor did the Circuit Court articulate such in denying Houston's motion in limine. We perceive no hypothesis upon which the evidence in dispute may be said to illuminate the issue of Houston's intent.
We trust what we have said is sufficient to establish that the admissibility of this prior abuse evidence in the trial of this indictment is problematical at best. The probative value of the evidence regarding any fact of consequence in the action was quite dubious, particularly as a part of the prosecution's case-in-chief. Moreover, the prejudicial effect of the evidence was quite great. Houston's motion in limine should have been granted.

D.
Assuming arguendo the relevance[8] of the prior abuse evidence, there is also a question regarding its form. The great bulk of the evidence at issue was presented in a classic hearsay format, that is, each of the various witnesses testified to statements made by Paula which, for obvious reasons, could not be tested on cross-examination.
But Aldridge involved no hearsay proof. The disputed evidence of prior abuse came from medical expert witnesses who examined the infant and through x-rays. Shelton also involved medical expert testimony but added testimony of the defendant's mother-in-law that she personally witnessed his abuse and battering of the child. Cardwell consisted of a combination of medical expert testimony and personal eyewitness testimony from those who saw one or both of the defendants abusing the child, but no hearsay. Johnson concerned medical expert and x-ray testimony of prior abuse of the three-and-a-half-year-old victim.
Prior to the advent of the Mississippi Rules of Evidence, we had developed what had come to be known as the tender years exception to the hearsay rule.
Hearsay testimony concerning the details of a complaint of sexual assault is admissible where the complainant is "of tender years" if her statement is shown to have been spontaneous and without indication of manufacture, and if any delay in making the complaint is excusable insofar as it is caused by fear or other equally effective circumstances.
Gill v. State, 485 So.2d 1047, 1050 (Miss. 1986); Cunningham v. State, 467 So.2d 902, 905 (Miss. 1985); Williams v. State, 427 So.2d 100, 102-03 (Miss. 1983). "Tender years" was defined as under the age of twelve. Gill, 485 So.2d at 1050.
Two facts distinguish this case from those in which we previously applied the "tender years" exception. First, the exception has heretofore been limited to sex offense cases. On principle, there appears no reason for allowing the exception in sex abuse cases and disallowing it in cases of other forms of physical abuse such as that *609 charged here. The sex abuse  physical abuse distinction between this case and our prior cases is a distinction without a principled difference.
Second, more importantly, we have applied the "tender years" exception where the hearsay statements made by the victim related to the offense charged in the indictment. We are concerned today with hearsay statements made by Paula as early as the fall of 1977, when she was seven years old and in the second grade, and as recently as March of 1984, some fifteen months prior to the events charged in the indictment. Yet this again may upon careful examination prove a distinction without a principled difference.
The dispositive deficiency is that the tenets of the tender years exception have not been met. Williams and Gill recognize the exception only where the child's statement is shown to have been spontaneous and without indication of manufacture, and if any delay in making the complaint is excusable insofar as it is caused by fear or other equally effective circumstances. Williams, 427 So.2d at 102-103; Gill, 485 So.2d at 1050. None of the statements attributed to Paula was spontaneously uttered. By way of contrast, each was a response to questioning by counselor, nurse, teacher and the like. Statements elicited through questioning by definition lack the sort of spontaneity necessary to suggest trustworthiness and thus avoid the hearsay rule. Moreover, the question of delay is never addressed. Nothing before us explains how much delay there may have been between the events and Paula's statements, nor the reasons therefor. We hold, insofar as the evidence of Houston's prior acts of abuse was presented in the form of statements Paula made to others, that evidence was inadmissible hearsay. Receiving the evidence before the jury was error affecting a substantial right and requires reversal.

E.
There is a further problem with one piece of prior abuse evidence. We refer to testimony of Paula's school principal that in the spring of 1984 he confronted Houston  via the telephone  with charges of abuse and she hung up on him. The prosecution infers from this an admission.
When a person, with full liberty to speak, remains silent on being accused of a crime, his failure to reply or to deny the accusation is admissible as tending to show his guilt. The essential inquiry is whether a reasonable person would have denied under the circumstances. The fact of silence is admissible not as evidence of the truth of the facts stated, but to show the accused's admission, Pickle v. State, 345 So.2d 623, 627 (Miss. 1977), citing Robinson v. State, 235 Miss. 100, 108 So.2d 583 (1959), although the distinction is surely a bit subtle for most juries.
A trial judge should be cautious in allowing into evidence "admissions by silence". Bitner v. State, 293 So.2d 339, 343 (Miss. 1974). In Bitner, this Court quoted Tate v. State, 95 Miss. 138, 48 So. 13 (Miss. 1909) (quoting Greenleaf On Evidence) where it was said:
Nothing can be more dangerous than this kind of evidence. It should always be received with caution, and never received at all unless the evidence is a direct declaration of that kind which naturally calls for contradiction.
And in Thurmond v. State, 212 Miss. 36, 53 So.2d 44 (1951), this Court stated:
It is not to be assumed, however, that the mere presence and hearing of the accused is always sufficient to authorize its admission. The circumstances must be taken into account and these involve all matters which affect the propriety or occasion for a denial, and the question whether a normal reaction would evoke protests. The test frequently is embodied in the generality that "the defendant is called upon to deny the statement."
Thurmond, 212 Miss. at 42, 53 So.2d 44.
Silence, or as here hanging up the telephone, may be motivated by many factors other than a sense of guilt or lack of an exculpatory story. Admission by silence evidence should be received only where the only reasonable interpretation of the actor's conduct is an admission of the truth *610 of the fact clearly charged. On this record we have grave doubts whether Houston's hanging up the phone qualifies. It was error to admit the fact of it.

VI.

A.
Though we reverse on the point just noted, the pre-trial discovery issue concerns a recurring problem requiring discussion and comment.
On June 21, 1985, the Circuit Court ordered that discovery be completed within 120 days or, by October 21, 1985. At the same time the case was set for trial on December 2, 1985. By October 14, 1985, the prosecution had responded to the defense's discovery requests with 62 witnesses' names and addresses. On November 7, after the discovery deadline had passed, the prosecution added one more proposed witness.
On October 14, Houston filed her list of witnesses to be called, incorporating all persons listed in the prosecution's discovery response and adding four more proposed witnesses. This October 14 response included a statement that the list was not complete and would have to be supplemented. On November 15, 1985, Houston filed a motion requesting funds for the assistance of certain experts, including a psychologist, Dr. William B. Little, of Mid-South Counseling in Memphis, Tennessee. On November 19, the defense supplied one more name.
The critical defense discovery response was made on Monday, November 25, 1985, three days before Thanksgiving, and seven days before trial, and thirty-five days after the court-imposed discovery deadline. On that date Houston filed a supplemental reciprocal response listing 48 witnesses. That list included: eight names which had previously been supplied by the prosecution; two names which had previously been supplied by the defense; and, four names which were supplied by the defense, on the same date, November 25, 1985, on a separate supplemental response. This list of 48 names then was, a list of 38 new names. Four of those 38 were duplicated on a co-extensive list, therefore, the list included 34 new names. It appears that these persons were for the most part neither fact or occurrence witnesses regarding the murder, nor experts. Their addresses are all in south Panola County, and they were to be used as mitigation witnesses at sentencing.
Another supplemental defense response filed on November 25, 1985, listed Dr. Little, of Mid-South Counseling, and three members of his staff. (Bear in mind that Dr. Little's name had been disclosed ten days earlier in Houston's motion for funds to hire expert witnesses.) This response stated that the Mid-South Counseling report would be provided as soon as it was available. On Wednesday, November 27, the defense supplied Dr. Little's report, averring that they had received the report at 4:00 p.m. on November 26, 1985. For context, recall that back in June, 1985, trial had been set to begin on Monday, December 2, 1985.
On November 25, 1985, the prosecution moved to exclude all of the witnesses supplied that day, except those listed in the defendant's earlier reciprocal responses. The prosecution accused the defense of sandbagging, noting that the trial date had been set for five months, and made an alternative motion that sanctions be leveled against defense counsel. At no time did the prosecuting attorneys request a continuance or ask for additional time to interview the witnesses or develop possible rebuttal evidence.
After hearing on the matter the Circuit Court excluded all witnesses not included in earlier responses or in the prosecution's responses, because the disclosures were not timely, as this was the "only proper remedy" where the defense had had months to prepare. As a result of this ruling, Houston had fourteen witnesses at her disposal, two of whom were herself and her husband, and eight of whom were on the prosecution's list. The defendant called two of these fourteen in the sentencing phase.
The defense further supplemented its discovery responses on December 2 and 3, *611 1985, by adding the names of Dr. Helen C. Robertson, Ph.D., a Whitfield psychologist, and Dr. Irving P. Unikel, an Atlanta psychologist. Appended to the supplement listing Dr. Robertson was a letter from her to Jones dated November 21, 1985. The supplement listing Dr. Unikel averred that Dr. Unikel's report had not been received by co-counsel until Friday or Saturday, November 29 or 30, 1985, and that Jones, the undersigned attorney, had not learned of its existence until Monday, December 2, 1985. Drs. Robertson and Unikel would have testified in the sentencing phase regarding Houston's personalty disorder. On December 4, the State moved to exclude, and these two witnesses were excluded as not having been timely disclosed, and the motion was granted.

B.
One point need be made clear at the outset. The Circuit Court has the authority, subject to constitutional limitations, to fix discovery cutoff deadlines and enforce them through appropriate sanctions. Nothing in Rule 4.06, Unif.Crim.R.Cir.Ct. Prac. (1979 as amended), addresses the point. We regard this authority inherent within the Court though it be not expressly provided in the rules. But see Rule 4.09(2), Miss.Unif.Crim.R.Cir.Ct.Prac. (1979).
Moreover, there can be no doubt that, subject to constitutional limitations, discovery obligations in criminal cases may be made reciprocal. See Rule 4.06(c), Miss. Unif.Crim.R.Cir.Ct.Prac. (1979, as amended). Where a defendant violates a discovery obligation  either imposed by the rule or by a discovery management order, the Circuit Court has available to it a wide array of sanctions, one of which may include exclusion of the evidence. See Coates v. State, 495 So.2d 464, 466-68 (Miss. 1986); see also Taylor v. Illinois, 474 U.S. ___, 108 S.Ct. 646, 98 L.Ed.2d 798, 814 (1988). We must never forget, however, that the trial for life or liberty is not a game and that discovery rules, like other rules of procedure, are not an end in and of themselves but a means to the end that we dare call justice. To that end, we administer our discovery rules with a strong bias in favor of the court and jury receiving and considering all relevant and otherwise admissible evidence. This is as true for the defense as the prosecution.
Recognizing that problems of fairness occur when there is late production of evidence, exhibits or witnesses who ought to have been disclosed much earlier, we have evolved a procedure which we believe is consistent with and, in fact, promotes our twin goals of (1) utilization of all relevant and otherwise admissible evidence and (2) fairness to the opposing party. That procedure was originally stated in Box v. State, 437 So.2d 19, 23-24 (Miss. 1983) (Robertson, J., specially concurring) and has been applied in a number of cases[9] including most recently Cole v. State, 525 So.2d 365, 367-68 (Miss. 1987) (a case where the prosecution violated its discovery obligations); and Darghty v. State, 530 So.2d 27, 31-32 (1988) (a case where the defense violated its discovery obligations).
The essence of that procedure is that, where faced with a discovery violation, technical or otherwise, in a criminal proceeding, the Circuit Court should  pre-trial or during trial
(1) Upon objection by a party, give that party a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witnesses, inspecting the physical evidence, etc.
(2) If, after this opportunity for familiarization, the objecting party believes that it may be prejudiced by lack of opportunity to prepare to meet the evidence, it must request a continuance. Failure to do so constitutes an acquiescence that the trial may commence or proceed and that the discovery rule violator may use the evidence *612 as though there had been no discovery violation.
(3) If the objecting party requests a continuance, the discovery violator may choose to proceed with trial and forego using the undisclosed evidence. If the discovery violator is not willing to proceed without the evidence, the Circuit Court must grant the requested continuance.[10]See Cole v. State, 525 So.2d at 367-68, Darghty v. State, 530 So.2d at 31-32.
Our Rule 4.06(c) mandates respect for constitutional limitations. Enforcement of court-imposed discovery cutoff deadlines is similarly limited. Suffice it to say that in a capital murder case, use of the sanction of exclusion to shut down the defendant's entire sentencing phase presentation raises serious due process problems.
In this context, the radical sanction of exclusion of a substantial portion of the defendant's evidence is one that should rarely be used. Generally, it ought be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage. See Taylor v. Illinois, supra. Today's is simply not such a case. In the case of serious discovery misconduct by an attorney, the Circuit Court has authority to enforce the discovery rules and any discovery order by imposing fines or costs on the attorney personally.
We hold that the Circuit Court erred when it excluded the defense witnesses without following the Box guidelines. A strong argument may be made that the error affects only the sentencing phase. In view of our holding on the evidence of prior abuse issue, we need not decide the point.

VII.
For the reasons stated hereinabove, the conviction of Houston of the crime of capital murder and the sentence imposed thereupon are vacated and reversed, and this case is remanded to the Circuit Court of Panola County, Mississippi, for a new trial consistent with this opinion.
REVERSED AND REMANDED FOR A NEW TRIAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ANDERSON and ZUCCARO, JJ., concur.
SULLIVAN, J., not participating.
GRIFFIN, J., specially concurs by separate written opinion.
GRIFFIN, Justice, specially concurring:
I concur in the result reached in this case; however, I am of the opinion that Aldridge v. State, 398 So.2d 1308 (Miss. 1981) allows the introduction of the series of injuries inflicted upon the victim, but that case does not support the introduction of hearsay testimony as offered in the case sub judice.
I would reverse because of hearsay and nothing else.
NOTES
[1] The evidence of Houston's felonious abuse of Paula "on or before June 3, 1985," was quite powerful. In addition to Houston's confession that she strangled Paula with "a pink macrame belt," consider the testimony of Dr. Thomas Bennett, the State Medical Examiner. Dr. Bennett testified concerning the results of the autopsy performed between 11:00 p.m., June 3, and 2:00 a.m., June 4, 1985. There was dried blood in the hair and on the face and bloody fluid coming from the nose. Paula received a minimum of seven distinct blunt force blows to the head prior to death. Three of the blows were to the scalp and were forceful enough to cause extensive bruising, but did not fracture the skull. Severe blows to each eye were apparent. The whites of the eyes were hemorrhagic and the lids were extremely swollen. The blow to the right eye caused more trauma than the blow to the left eye, and the skin around the right eye and on to the temple and cheek was abraded. Her lips were bruised and swollen and her lower lip was lacerated. Paula also received a forceful blow to the right ear. These injuries were inflicted anywhere from two minutes to two hours before death, depending on their severity, and did not cause loss of consciousness. There were two distinct ligature marks around the neck, each one inch to one and a half inches wide. Death, which could have occurred anywhere within twenty-four hours before the autopsy, was caused by strangulation.

Beyond this Dr. Bennett noted that there were two marks around Paula's neck. Dr. Bennett offered his opinion that the belt was probably moved, that a person strangled in such manner would experience sensations of pain and fear, and that death was hardly instantaneous.
[2] The case was tried in the first week of December, 1985. The Mississippi Rules of Evidence became effective on January 1, 1986. The present assignment of error is decided in its entirety under the law as it existed at the time of trial. On the remand we order hereafter, of course, all evidentiary questions will be governed wholly by the Mississippi Rules of Evidence.
[3] The instruction given the jury on this point reads as follows:

S-3
The Court instructs you that evidence of past abuse by the Defendant against Paula Houston, if any, may not be considered proof that the Defendant killed Paula Houston, but may be considered by you in deciding the issue of malice aforethought or intent on the part of the Defendant, if you otherwise first find that the Defendant did kill Paula Houston.
Accordingly, if you find from the evidence in this case beyond a reasonable doubt that the Defendant did on June 3, 1985, kill Paula Houston, a human being; and if you further find from the evidence in this case beyond a reasonable doubt that the Defendant committed any past acts of child abuse against Paula Houston, you may consider such past abuse, if any, only in determining the intent of the Defendant and whether the Defendant acted with malice aforethought.
[4] See, e.g., the indictment in Shelton v. State, 445 So.2d 844 (Miss. 1984), discussed below, charging felonious child abuse "on or about the 22nd day of March, 1981, ... to September 20, 1981, and between said dates."
[5] Recognition that felonious child abuse may be an episodic offense presents considerable difficulty in the context of the form of Section 97-3-19(2)(e) of our capital murder statute. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1987). That subsection elevates murder to capital murder when the defendant kills while "engaged in the commission of" any one of several so-called underlying felonies. Most of these, e.g., rape, robbery, are crimes that will be closely related to the murder in point of time. Even kidnapping, which may continue over a period of time, will bear a logical factual nexus to the killing of the kidnap victim. But how does this work with an episodic underlying felony, to-wit: felonious child abuse, where an incident of prior abuse occurs months before the killing and where there has been a break in the causal and temporal chain? We do not answer this question today, as the evidence of Houston's felonious abuse of Paula on or before June 3, 1985, was quite substantial.
[6] Three other relatively recent felonious child abuse cases resulting in death  and in homicide prosecutions  ought to be noted. See Wetz v. State, 503 So.2d 803 (Miss. 1987); Daumer v. State, 381 So.2d 1014 (Miss. 1980); and Neighbors v. State, 361 So.2d 345 (Miss. 1978). Little in these cases speaks to the problems before the Court today.
[7] This, of course, creates the necessity for conducting a whole series of mini-trials within the trial. Some of the prior abuse evidence before us today is largely of a sort Houston could not possibly defend against. Consider, for example, the testimony of Paula's schoolmate, Dovie Turner, who reported that Paula told her that her mother beat her a number of times over a number of years  without the first mention of a specific date.
[8] One quite elusive problem before us lies in the Circuit Court's indiscriminate approach to admissibility of the prior abuse evidence. Except for the double hearsay statement offered by Paula's school guidance counselor  that in the fall of 1977 a welfare worker told the counselor that Houston said ..., everything was admitted. To be specific, Paula's fall 1979 "100 licks" statement unattended by any personal observation of physical injury, bruises or the like, seems quite untrustworthy. We find no predicate for the testimony of the counselor and nurse that Paula came to school bruised one day in September, 1981. Paula reportedly said her cuts and abrasions were caused by a bicycle accident. The nurse said she thought Paula was telling the truth. Children do have bicycle accidents other than those caused by abusive mothers. The testimony of Paula's seventh grade girlfriend of the numerous times Paula said she was abused seems quite elusive and impossible to cross-examine or rebut. The "tears on the bus" testimony was without a credible predicate that the tears were caused by felonious child abuse by Houston, nor was it sufficiently specific. In short, a great portion of the prior abuse evidence strikes us as well below the minimum admissibility threshold on at least three grounds: relevancy, predicate and trustworthiness.
[9] The State is hard pressed to argue that we had not  as of December 1985  unequivocally declared the Box guidelines the law. At the State's importuning we had  on May 1, 1985  enforced Box retroactively against a defendant in affirming a death sentence. Cabello v. State, 471 So.2d 332, 343 (Miss. 1985). We also accepted and followed the Box concurrence on December 4, 1985, in Jones v. State, 481 So.2d 798, 803 (Miss. 1985).
[10] It goes without saying that, where the offending party is the defendant, the discovery violation constitutes sufficient misconduct that the defendant is stripped of any former jeopardy objection to a new trial, and, as well, constitutes good cause within our 270 day rule. Miss. Code Ann. § 99-17-1 (Supp. 1987).