# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01318-COA

**DEMARCUS WOOTEN**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                              **APPELLEE**

DATE OF JUDGMENT:               11/30/2023
TRIAL JUDGE:                    HON. JAMES McCLURE III
COURT FROM WHICH APPEALED:      TATE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                                BY: W. DANIEL HINCHCLIFF
                                    STACY FERRARO
ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                BY: JULIANNE KAY BAILEY
NATURE OF THE CASE:             CRIMINAL - FELONY
DISPOSITION:                    AFFIRMED - 10/14/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., WESTBROOKS AND LASSITTER ST. PÉ, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.    Demarcus Wooten was indicted for first-degree murder and convicted of the lesser-included offense of manslaughter for the shooting death of his girlfriend, LaRhonda Jackson. The circuit court sentenced him to serve twenty years in the custody of the Mississippi Department of Corrections. On direct appeal, Wooten raises numerous issues, including that the circuit court erred in evidentiary decisions made before and during trial and that the circuit court erred in granting a jury instruction. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Wooten and LaRhonda Jackson had an on-and-off relationship during the two years

preceding Jackson's death. Jackson had two children who are not Wooten's biological children. On February 12, 2022, two months after Jackson and Wooten broke up, Wooten texted Jackson, telling her he wanted to take her to the mall in Memphis to buy the kids Valentine's Day gifts. When Wooten arrived at Jackson's house a few hours later, Jackson asked if they could go the next day instead. Wooten went home and spent the night with another woman he was seeing.

¶3.     The next morning, Jackson texted Wooten to ask if they were still going to go to the mall. Around 2:00 p.m. that day, Wooten picked up Jackson and Jackson's two-year-old son in his white Tahoe SUV. Wooten drove, Jackson sat in the passenger seat, and her two-year-old son sat in the backseat in a car seat. During the car ride, the couple discussed the possibility of getting back together. At 2:38 p.m., Wooten stopped by his aunt's house to check on her because she had just been released from the hospital. Jackson and her son stayed in the car while Wooten went inside his aunt's house. Wooten's aunt's front-door Ring camera showed Wooten leaving her house at 2:44 p.m.

¶4.     According to Wooten, when he left his aunt's house and got back in the car, Jackson was angry, and she confronted him about seeing another woman. Wooten told the police that he and Jackson began to argue, which resulted in Jackson pulling out a gun from the center console of the car and pointing it at him. Wooten told authorities that he always keeps his gun in the center console, especially if he is traveling to Memphis. Wooten explained that he and Jackson fought over the gun, and the gun went off, which led to Wooten crashing his white

2

Tahoe into a tree on the side of the road less than one mile up the road from his aunt's house. Wooten tried to take the gun from Jackson, and when he grabbed it, the gun went off again, hitting Jackson in the sternum. Jackson's body slumped over the center console. Wooten stated that he could not get out of his car because his door was smashed in, and he had to jump over Jackson's body in the passenger seat to get out. Once he got out of the car, he opened the hatch and grabbed the child. Wooten then went to the side of the road and flagged down a car driving by, asking for help and saying that "his girl had shot a gun." Deer-camera footage showed the crash happened at 2:48 p.m.[1]

¶5.     During the defense's opening statement at trial, Wooten's counsel stated that the State had the burden of proving "premeditated" murder. The State objected on the ground that the word "premeditation" is not part of the statutory language for the crime of murder. The court sustained the objection. The State called eight witnesses, including Perry Dover, the eyewitness who came upon the car crash shortly after it happened, the sheriff's dispatcher, the sheriff's deputy, Captain Lisa Sanders, and several forensic specialists. Dover testified that while driving home from his friend's house, he saw Wooten getting out of the SUV and made a U-turn to check if anyone needed assistance. Upon approaching the scene, Dover saw Wooten crying and holding Jackson's two-year-old son on the side of the road. Dover asked Wooten if anyone else was in the car. Wooten replied by repeatedly saying, "She is dead."

---

[1] The photographs from the footage only showed the aftermath of the crash. No photos captured the struggle between Wooten and Jackson before the crash.

Wooten told Dover that Jackson had tried to shoot him, and when he went to block the gun, it went off and shot her. Dover approached the vehicle and called out to Jackson three times, but he received no response. Dover testified that the driver's door, rear hatch, and passenger door were open. At 2:54 p.m., Dover called 911 to report the accident.

¶6.     Deputy Stanley Perry testified that he was the first officer to arrive at the scene. On arrival, he saw Dover standing by Wooten, who was carrying Jackson's son. Perry turned on his body camera and walked to the vehicle. He testified that all the doors were closed except the hatch. Perry immediately noticed Jackson's body leaning over the console into the back seat between the driver's seat and the passenger seat in the direction of where her son would have been sitting. Perry spoke with Wooten, who told Perry where he believed the gun was located. Wooten also gave Perry his phone and password.

¶7.     Captain Lisa Sanders took the stand and testified that upon searching the car, she found a .40 caliber-Glock firearm on the driver's floorboard underneath the front of the driver's seat, and she found the gun holster in the console. Deputies on the scene found two shell casings: one was inside the car on the back floorboard on the driver's side, and the other was on Veazey Road. The car was later towed to the impound lot at the sheriff's department. Wooten was also taken to the Tate County Sheriff's Department, where he was informed of his *Miranda* rights and interviewed by Sanders.[2] A video of this interview was admitted into evidence at trial.

---

[2] *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1996).

¶8.  Sanders also testified about Facebook messages exchanged between Wooten and Jackson, which were obtained from the confiscated cell phones. In her testimony, Sanders expressed her opinion that the messages illustrated a very toxic relationship. Sanders also explained that it would have been difficult for Jackson to access the center console while Wooten was driving. She noted that Wooten's arm would likely have been resting on or near the console, making it difficult for Jackson to open it. To access the center console, Jackson would have had to reach to press the button to unlock it, lift the console, look over it to locate the gun, remove the gun from the holster, return the holster to the console, and then finally have access to the gun.

¶9.  Finally, several forensic experts testified that the manner of death was a homicide caused by a single gunshot wound to the sternum. According to the autopsy report, the bullet entered Jackson's body in the middle of her chest. The bullet was removed from the left side of her back, and the bullet traveled "front to back, downward, and slightly to the left."

¶10.  During the jury instruction conference, the circuit court gave Jury Instruction C-5, which stated: "The Court instructs the jury that it is just as much your duty under the law and upon your oaths as jurors to turn an innocent person loose by your verdict of not guilty, as it is for you to convict a guilty person." Wooten did not object to this instruction at trial. The jury ultimately found Wooten guilty of the lesser-included offense of manslaughter. Following his sentencing, Wooten moved for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, which the court denied on November 30, 2023.

¶11. At a pretrial hearing on March 30, 2023, the court granted Wooten indigent status for

the purpose of appointing a state-funded expert witness.[3] The court approved Dr. Eric Warren

as Wooten's forensic expert. After the court granted the motion, the State asked the court:

> [O]bviously the Court is going to end up granting a continuance based on this, because the trial is two weeks away. Can we deal with – can we address today a timeline, because what I don't want to have is this case roll back up for trial in about two to three months, and we still haven't had the expert get what he needs from the State. We will make whatever available for inspection for this expert . . . I just want this addressed before the next plea day, in case there is going to be a longer delay due to the expert. It won't be on the State's behalf, we will make anything available for the expert, since the Court has now ordered it.

Wooten's attorney agreed that "that's fair" and a status conference was set for May 11, 2023.

A plea setting was scheduled for May 24, 2023, and trial was set for June 19, 2023. Wooten

was also instructed to let the prosecution know by 5:00 p.m. the following day when to

expect the expert report.

¶12. At the May 11, 2023 status conference, Wooten stated that the expert had examined

the SUV on May 3 but that the expert report was not prepared yet. The State indicated that

it needed the report far enough in advance of the June 19 trial date to determine whether the

State needed its own expert. The court gave Wooten's expert until May 23, 2023, to produce

---

[3] While Wooten did not attach an affidavit of indigency to his motion for an expert, he testified in person to his indigent status at the March 30 hearing. Wooten, who was incarcerated at the time, also testified that his family was working to raise money to post his bond, which had been previously reduced from $500,000 to $250,000. In granting the motion, the court cited *Brown v. State*, 152 So. 3d 1146, 1169 (¶99) (Miss. 2014) (approving state-funded expert even where defendant had retained his own counsel paid for by third party).

the report to the State, stating that "if they have any problems, it's your responsibility to let the court know about it to address them and solve them."

¶13.    The record shows that the next status conference was held on August 10, 2023. Wooten's attorney represented that the defense was not ready for trial. According to Wooten's attorney, the expert report was not yet available because the State had failed to provide digital versions of the photographs produced in discovery. The majority of the status conference was then spent discussing whether, by whom, and in what format the State's evidence had been provided to the defense. Wooten's attorney stated:

> [W]hat [the expert] is suggesting is that when he zooms in it's pixelated, so he's asking for a digital copy of the photos. And so I can't get the report unless I have the digital form of those photos from the expert. And so that's where we currently are, trying to get that information from the State.

The State's attorney responded:

> Your Honor, the State filed a response, a discovery response in this case July 29th of 2022. In that response photographs were printed out and provided as attachments. In addition to that, Ms. Washington with my permission, went to see Captain Sanders at the Tate County Sheriff's Department I believe on two occasions, and Captain Sanders is here and can testify as to both of those, and correct me if I misstate anything.
>
> At the time that she went to see Captain Sanders, I believe she took an external drive and she was provided with copies directly from Captain Sanders of the audio video recordings, as well as photographs straight from the SD cards onto the external drive that Ms. Washington provided. I think she didn't have enough memory on the drive she first came with, so she came back, is my understanding, and got the remainder of the items . . . .
>
> So today is not the first time that I've said, you already have the photographs, if you need them in a different format, then format them differently. We have, in fact, Your Honor provided the photographs in hard copies. We've provided

7

the stills from the deer camera. We have made Captain Sanders' file available, she's downloaded everything and put it onto an external drive for [Wooten's attorney]. I don't know how many times we have to provide the same information.

. . . .

We've complied with the rule, Your Honor. We've provided both printouts, as well as electronic photographs onto a device or a drive that Ms. Washington has. She's got all the photographs that were taken. . . . It concerns me that her expert wants to be able to manipulate a digital image. I don't know why they're not clear in the way that they were taken, but they are what they are, Your Honor. If they were zoomed in when the officer took them, then they were zoomed in. If they were not, they were not, but that's the physical evidence.

¶14.    Wooten's attorney said of the prosecutor, "She didn't give it to me in digital format." The court then directly asked the prosecutor, "[D]o you have it in digital format or do you not?"  The prosecutor responded:

I'm holding probably a two to three inch thick pile of papers that are contained by a rubber band. This is a full and complete copy of the discovery that was provided by the State, the response to the motion for discovery in this case for Mr. Wooten. It includes color copies. They were provided by my office to Ms. Washington, not through Captain Sanders.

[Wooten's attorney] went with a digital drive to Captain Sanders, and all of the audio video recordings and photographs were placed on that drive. That is what she's asking for. She already has it, Judge.

Wooten's attorney still represented, "I don't have the photos in the digital format, Your Honor. It's – I have, I do, Detective Sanders gave me, I have audio –." The court then stated, "[O]kay, look, I understand. You've told me, you don't have them in digital format. Captain Sanders, do you have photographs in a digital format? It's a yes or no question."

¶15.    Captain Sanders responded:

Your Honor, everything that I took at the scene with my camera, the deer camera that was seized at the scene had the SD card, from a deer camera, was downloaded to my computer at work. It was placed in a folder, one folder said deer camera pictures the other one says crime scene. I transferred those over to her thumb drive. To me that's digital format.

¶16.    The court then told Wooten's attorney that if she wanted another drive with the photos on it, she would need to go obtain that from Captain Sanders within one week. At the conclusion of the conference, the court stated: "Okay. All right, well, I've got news for both sides, if I've got a deadline and y'all haven't met it, I'm going to exclude it. It's not coming in . . . . This case has been continued for a year."[4] The court gave one final extension, and, after discussing everyone's schedules, set a status conference for August 23, 2023.

¶17.    The transcript reflects that the August 10 status conference ended with the court stating the following:

| THE COURT: | All right, we will do it at 9:00 a.m. the 23rd in Coffeeville . . . . Anything else from the defense . . . ? |
| DEFENSE | No, Your Honor. |
| THE COURT: | Anything else from the State . . . ? |
| STATE: | No, your Honor. |
| COURT: | That will conclude this matter on the record. |

---

[4] The State's attorney also noted that Wooten's expert took photographs of the vehicle when he inspected it on May 24, 2023, but that these photographs had not been provided to the State as requested in discovery.

9

¶18. The expert report was not produced, and Wooten's attorney did not appear at the 9:00 a.m. status conference on August 23, 2023.[5] The court summarized the timeline of the four continuances of the case and held, "The court will exclude any report from any expert witness on behalf of the defense." In a subsequent order supplementing the bench ruling, the order stated that "Counsel for the Defendant and Defendant lack good cause for the willful violations of this court's orders. All of this being done while Defendant is out on bail is further evidence of the discovery violations being willful and committed to obtain a tactical advantage."

¶19. In a motion for reconsideration, Wooten's counsel explained that she had mixed up the time of the August 23, 2023 hearing and thought it was in the afternoon. Counsel further asserted that she had not received all the photographs she needed until August 30. According to the State, the photographs provided on August 30, 2023, were from the deer camera on days other than the day of the crash. The State represented that those photographs were not relevant to the trial, that the State had no intention to use them at trial, but that it would have provided them earlier that if Wooten had clearly communicated that those were the photographs being requested. Moreover, Wooten did not reach out to Captain Sanders to request these additional photographs until August 17, which fell outside of the circuit court's deadline announced at the August 10 conference. The court denied the motion for reconsideration.

---

[5] The defendant was not present either. At that time, Wooten was released on bail.

¶20. Wooten now appeals.

## STANDARD OF REVIEW

¶21. We apply an abuse-of-discretion standard when reviewing a circuit court's decision to admit or exclude evidence, including expert testimony. *Dedeaux Util. Co. v. City of Gulfport*, 63 So. 3d 514, 520 (¶8) (Miss. 2011). Unless we conclude that the circuit court's "decision to admit or exclude evidence was arbitrary and clearly erroneous," the decision shall stand. *Id.* Additionally, "[j]ury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012) (citing *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010)). We "review[] jury instructions as a whole[,]" and "[w]hen those instructions, 'taken as a whole fairly—although not perfectly—announce the applicable primary rules of law . . . no reversible error will be found.'" *Moody v. State*, 202 So. 3d 1235, 1237 (¶7) (Miss. 2016) (quoting *Boyd v. State*, 47 So. 3d 121, 123-24 (¶10) (Miss. 2010)).

## DISCUSSION

¶22. Wooten argues on appeal that the circuit court (1) abused its discretion when it excluded the defense expert witness and held that the State only had to produce evidence it intended to use at trial, (2) incorrectly sustained the State's objection during Wooten's opening statement, (3) admitted police opinion testimony about Wooten and Jackson's relationship, and (4) gave misleading and contradictory jury instructions, and he argues that the cumulative effect of these errors also warrants reversal. Finding no reversible error, we

11

affirm.

### I. Whether the circuit court erred by excluding Wooten's expert witness as a sanction.

¶23. Wooten argues that the trial court erred in excluding his expert witness as a sanction for his failure to timely produce his expert witness report. Once a "circuit court is made aware of [a] party's failure to comply" with discovery requirements, the court may admit the evidence, grant a continuance, or "enter such an order as it deems just under the circumstances." *Morris v. State*, 927 So. 2d 744, 747 (¶8) (Miss. 2006). Under the Mississippi Rules of Criminal Procedure, the court may exclude an expert witness as a sanction for failing to adhere to a discovery request. MRCrP 17.9. The exclusion of evidence "[g]enerally . . . ought [to] be reserved for cases in which the defendant participates significantly in some deliberate, cynical scheme to gain a substantial tactical advantage." *Houston v. State*, 531 So. 2d 598, 612 (Miss. 1988). "The weight of the sanction should be based on the motivation of the offending party in violating the discovery rule." *Turner v. State*, 292 So. 3d 1006, 1022 (¶43) (Miss. 2020) (citing *Coleman v. State*, 749 So. 2d 1003, 1009 (¶17) (Miss. 1999)). This Court "must determine (1) whether such a violation occurred and . . . (2) whether the exclusion of this evidence was an appropriate remedy." *Myers v. State*, 145 So. 3d 1143, 1147 (¶10) (Miss. 2014) (quoting *Williams v. State*, 54 So. 3d 212, 213-14 (¶5) (Miss. 2011)).

¶24. The court's sanction in this case occurred after the defense had been granted multiple continuances, failed to appear at a fourth status conference, and failed to produce the expert

report by a deadline that had previously been extended. Wooten argues that the delay was due to the State's failure to provide digital versions of the photographs produced and used as evidence. However, the representations of the State and the Sheriff's Department at the August 10 status conference indicate that the State had provided Wooten hard copies of all evidence from the day of the crash, and the Sheriff's Department had provided digital copies of the evidence. Further, to the extent Wooten did not have or needed to obtain any further digital evidence, Wooten was given an additional extension of a week by the court to ask the State for additional materials. However, Wooten's attorney did not reach out to the State during this window. Finally, Wooten failed to appear at the 9:00 a.m. August 23 status conference. As reflected in the transcript, this date and time had been announced at the August 10 status conference, at which the court announced that the expert would be excluded if the report was not produced by that time. The State strongly disputes that Wooten did not have access to all the information necessary to produce the report, and the State notes that the additional deer-camera photographs from dates other than the crash were requested after the court's deadline announced on August 10.

¶25.    Looking at the totality of the circumstances, we cannot say that the circuit court abused its discretion in determining that the defense expert should be excluded. A single missed status conference would not be grounds for the extreme sanction of excluding a defense expert in a criminal trial. Neither would a legitimate delay in preparing an expert report when the expert lacks essential evidence the State has failed to produce. Here, it

13

appears that multiple considerations went into the circuit court's decision to exclude the expert, including that Wooten had been granted multiple extensions, that Wooten had failed to provide timely updates as ordered, that Wooten did have access to all materials from the day of the crash, and that Wooten was provided, but did not timely take advantage of, a final extended opportunity to obtain any additional digital materials.[6] The circuit court did not reversibly err here.

## II. Whether the circuit court erred in sustaining the State's objection during the defense's opening statement.

¶26. Wooten contends that the circuit court erred by upholding the State's objection related to a misstatement of law during his opening statement on appeal. He specifically claims that he correctly stated that the State had the burden of proving he committed premeditated murder. The State counters, explaining that if the court erred in sustaining the objection, it was a harmless error because Wooten was ultimately convicted of manslaughter, which does not require a level of premeditation or deliberate design. We agree. Our supreme court has held that "the purpose of an opening statement is to inform the jury what a party to the

---

[6] Wooten argues that the court was incorrect to state that the State was only required to produce evidence it intended to use at trial, citing Rule 17.2(4)'s provision that the State is required to disclose evidence "relevant to the case or which may be offered into evidence." While Wooten does not specify, this argument presumably relates to the request for photos from the deer camera on days other than the crash. Any error in the court's statement of the rule is harmless given that the defense asked for this information after the court's last deadline and, in fact, was provided all this material before trial. Wooten does not argue that any of the photographs taken on days other than the crash were necessary to compile the expert's report.

litigation expects the proof to show." *Slaughter v. State*, 815 So. 2d 1122, 1131 (¶52) (Miss. 2002) (quoting *Crenshaw v. State*, 513 So. 2d 898, 900 (Miss. 1987)). Wooten was not ultimately convicted of first-degree murder; therefore any error in sustaining the State's objection to characterizing first-degree intent is harmless *in this case*.

### III. Whether Wooten failed to preserve the issue of the police testimony on appeal.

¶27. Wooten argues that the circuit court erred by admitting Sanders' testimony on the nature of his relationship with Jackson without admitting Sanders as an expert under Mississippi Rule of Evidence 702. He argues that, while an expert may opine on the ultimate issue within limits, this should not extend to lay opinions. *See Hart v. State*, 637 So. 2d 1329, 1338 (Miss. 1994)*, abrogated on other grounds by Taylor v. State*, 287 So. 3d 202 (Miss. 2020). Wooten did not object to Sanders' testimony at trial on the specific ground that she was not admitted as an expert witness. We agree with the State that this issue is barred from our consideration on appeal and that grounds are not present supporting a review for plain error. *See Doss v. State*, 709 So. 2d 369, 372 (¶1) (Miss. 1996).

### IV. Whether the circuit court erred in giving jury instruction C-5.

¶28. Wooten argues that the circuit court erred by giving jury instruction C-5, which stated:

> The Court instructs the jury that it is just as much your duty under the law and upon your oaths as jurors to turn an innocent person loose by your verdict of not guilty, as it is for you to convict a guilty person.

Wooten argues that this instruction could confuse the jury by leaving the impression that the duty to find a defendant not guilty for lack of evidence (i.e., proof) beyond a reasonable

15

doubt equates to a necessity for a defendant to prove actual innocence. Wooten did not object to this jury instruction at trial, thereby failing to preserve the issue for appeal. Additionally, Wooten acknowledges that this Court has affirmed the use of this instruction. *See Johnson v. State*, 19 So. 3d 145, 147 (¶¶10-11) (Miss. Ct. App. 2009) (holding that the jury instructions did not impermissibly shift the burden of proof from the State to the defendant); *see also Brock v. State*, 348 So. 3d 1007, 1012 (¶11) (Miss. Ct. App. 2022). Given that our appellate courts have approved the use of this instruction, it does not present grounds for plain error review. This issue likewise is without merit.

**V.      Whether reversal is required under the cumulative-error doctrine.**

¶29.    Wooten argues on appeal that by viewing all the issues together, they present a cumulative error. "Under the cumulative-error doctrine, individual errors may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Abram v. State*, 309 So. 3d 579, 586-87 (¶22) (Miss. Ct. App. 2020) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)). "[P]rejudicial rulings or events that do not even rise to the level of harmless error will not be aggregated to find reversible error." *Mouton v. State*, 227 So. 3d 1079, 1086 (¶28) (Miss. 2017). Here, to the extent that the circuit court erred at all, the cumulative effects of the suggested errors do not rise to a level that deprived Wooten of a fundamentally fair trial. This issue is without merit.

**CONCLUSION**

16

¶30. The circuit court did not err in excluding Wooten's expert witness. The State's sustained objection to defense counsel's reference to "premeditation" in opening statements is harmless given that Wooten was ultimately convicted of manslaughter. Wooten did not object to Officer Sanders' lay testimony at trial, and the issue was therefore not preserved for appeal. The court did not err in giving jury instruction C-5. Accordingly, we affirm Wooten's conviction and sentence.

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**