# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01129-COA

**WAYNE FRASER A/K/A WAYNE FRASHER A/K/A WAYNE SYDNEY FRASER**         **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/01/2023 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/13/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., EMFINGER AND LASSITTER ST. PÉ, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. Wayne Fraser was indicted for the crime of first-degree murder, pursuant to Mississippi Code Annotated section 97-3-19 (Rev. 2020), for killing his wife, Natalie. After a five-day jury trial in the Circuit Court of Lowndes County, Mississippi, Fraser was found guilty of the lesser-included offense, culpable negligence manslaughter. Fraser was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections and now appeals his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. Wayne Fraser was a Scottish citizen residing in the United States and working for a

company based in Iowa called Allen Blasting and Coating. Fraser's employment required him to travel all over the country managing projects on-site. Fraser and his wife Natalie, a Texas resident, met online and had been married for ten years at the time of Natalie's death. Natalie was an English professor at Angelo State University and continued to live in San Angelo, Texas, as Fraser traveled around the country (as his employment required). In 2021, Fraser was temporarily residing in Caledonia, Mississippi, while completing a job. Although the couple primarily lived apart, they would frequently visit each other.

¶3. On December 30, 2021, Natalie was in Caledonia to spend the Christmas holiday with Fraser. On that morning, around 8:00 a.m., Lowndes County sheriff deputies and investigators arrived at Fraser's home in response to two out-of-state phone calls reporting Natalie's potential suicide and requesting a welfare check on Fraser. The first phone call came from Fraser's employer in Iowa. The second call came from Kory Ryan, Natalie's brother in Texas. Both individuals had received calls or text messages from Fraser telling them that Natalie was dead and that he was contemplating suicide as well. Fraser's employer, Chris Manion, testified that he received a text from Fraser between 6:30 and 7:00 a.m. on December 30, 2021, stating that Natalie was dead and that she "pulled the gun to her head whilst in my hand. This happened at 2:00ish - We go together." According to Manion, he was in a meeting when he first received Fraser's text message and did not respond immediately. Manion did not realize that Fraser was serious about the allegations in the text message until he called Fraser back after his meeting. After reading the text messages and speaking with Fraser, Manion believed that Natalie had committed suicide, and Manion's

2

sole focus became keeping Fraser alive until law enforcement could get to the home. While still on the phone with Fraser, Manion began texting another individual from the company's human resources department to find a way to get law enforcement to Fraser's home. Natalie's brother, Kory Ryan, testified that he received a phone call from Fraser, using Natalie's cell phone, at 7:35 a.m. that same day. According to Ryan, Fraser told him that Natalie had shot herself around 2:30 a.m. that morning. Fraser told Ryan that he had not called an ambulance or the authorities for help. Ryan further testified:

> So, I found a city number here in Columbus. I spoke to a very sweet woman named Betty. I called her. I said, I need to report a shooting. And I will never forget. She said, honey, you've got to call 911. I said, well, I can't. I'm in Dallas. And she said, honey, give me the address. I will call them for you. So, I gave her the address. She called me back after about 5 minutes. And she said they're on their way. She said as soon as I hear something, I will call you back, let you know. And then after that – after I hung up with her, I called my sister's phone back and spoke to Wayne.

When Ryan called Fraser back, he continued to question him about what happened to Natalie. Fraser again told Ryan that Natalie had shot herself. Ryan testified: "He said it twice. He said, I'm f***ed. And the police opened the door. And then the phone went off. The call dropped. And I called it back. It went straight to voicemail."

¶4.  When law enforcement arrived at Fraser's home, Fraser opened the door, and investigators discovered Natalie's body on the living room floor, across the room from her wheelchair.[1]  A 9-millimeter handgun was found on the couch nearby. Natalie had sustained a single gunshot wound to her neck. One bullet hole was found in the wall near her

---

[1] Natalie was paraplegic and wheelchair bound as a result of a car accident that she had been involved in when she was sixteen years old.

wheelchair next to the front door, as well as one 9-millimeter bullet casing. Multiple .380-caliber live rounds were found scattered around on the floor in the living room. While the crime scene was being processed, Fraser remained on the front porch of the home and was questioned by multiple investigators. Fraser participated in an additional interview in the back of an ambulance on-site.

¶5.     Deputy Sheriff Chris Griffin was the first officer to arrive at Fraser's house. Griffin testified that he had a conversation with Fraser while he was sitting on the front porch. Griffin stated that he asked Fraser why he and Natalie had the gun out and asked if Fraser had the gun in his hand when it was discharged. According to Griffin, Fraser stated that he was the one holding the gun when Natalie was shot. Griffin testified that when he asked Fraser if he and Natalie had been fighting, Fraser responded, "Never." According to Griffin, he did not see any blood on Fraser's body, with the exception of some blood on his finger. Griffin testified that Fraser admitted to sticking his finger in the bullet hole in Natalie's neck, trying to stop the bleeding. On cross-examination, Griffin testified, "[Fraser] was basically saying that they had been playing with the gun. And loaded the wrong ammo. She had loaded the wrong ammo. He went out and got the correct ammo. And he was holding the gun under her neck like this (demonstrating). And she reached for the gun. It went off." Griffin's interview with Fraser was captured on a police body camera, which was introduced into evidence at trial.

¶6.     Captain Daryl Nabors questioned Fraser at the scene inside an ambulance. Nabors testified that "[Fraser] told me that he went to [Natalie's] car and got the ammo, the .9

millimeter ammo." Fraser also told Nabors that he was holding the gun when it discharged, and Fraser admitted that he pulled the trigger. According to Nabors, Fraser told him that the shooting had occurred around 2:00 a.m.; however, law enforcement was not called to the scene until around 8:00 a.m. Fraser admitted to Nabors that the reason he did not call law enforcement was because he was contemplating suicide himself. Nabors' interview with Fraser was captured on a police body camera, which was introduced as well.

¶7. Detective Scott Glasgow testified Fraser admitted to him that he had the gun when Natalie reached up and pulled the gun to her neck and that the gun went off. According to Glasgow, Fraser told him that his finger was on the trigger when Natalie pulled the gun toward her. Glasgow testified Fraser stated that he was unsure if he was standing or sitting when the gun was fired.

¶8. Frank Peretti from the Mississippi Forensics Laboratory testified at trial regarding the autopsy he conducted in furtherance of the investigation. According to Peretti, Natalie's cause of death was a gunshot wound to the neck. He stated that the bullet entered her neck and hit the right carotid artery, traveling left to right and front to back. Peretti testified that it was his opinion that the gunshot wound was consistent with the weapon having been fired from at least two feet away. Peretti determined Natalie's manner of death to be homicide.

¶9. While Fraser was incarcerated, he sent Kory Ryan an email in which Fraser described specific details regarding the events leading up to Natalie's death and how the gun was fired. Notably, Fraser's email stated, "What happened within a few second[s] has sent me to HELL for eternity. First and foremost, what happened was an accident." Ryan also discovered

5

additional emails and pictures on Natalie's cell phone in the process of handling Natalie's estate. The emails that he uncovered were between Natalie and Fraser and dated back to 2019. The emails contained evidence of a history of abuse. Specifically, in an email dated September 24, 2019, Natalie wrote to Fraser:

> You've treated me like a dog for 10 f***ing years. You have beaten me repeatedly. You set me on fire and burned half of my hair off, and just recently you tried to attack me with an iron and chipped my motherf***ing tooth. And in all that time, I always took you back.

Over Fraser's objection, the emails were admitted into evidence at trial. Ryan also found multiple pictures saved on Natalie's cell phone that showed Natalie's face covered in bruises. The photos were also admitted into evidence at trial.

¶10. After the State finished putting on its case-in-chief, Fraser moved for a directed verdict. The court denied Fraser's motion. Fraser then called Dr. Jeff Goudeau as an expert witness in his case-in-chief. While the court accepted Goudeau as an expert in the field of firearms examination and analysis, Goudeau was not allowed to testify regarding his opinion as to the distance from which the fatal bullet was shot.[2]

¶11. At the end of trial, the jury found Fraser guilty of culpable negligence manslaughter. Fraser filed a "Motion for Judgment Notwithstanding the Verdict or, In the Alternative, For a New Trial," which the trial court denied. Fraser filed his notice of appeal raising four issues, which we will address below.

**ANALYSIS**

---

[2] As will be discussed in detail later, this portion of Goudeau's expert testimony was excluded by the trial court because it was not disclosed to the State until the fourth day of trial.

## I. Did the trial court err by allowing emails and pictures recovered from Natalie's cell phone to be admitted into evidence?

¶12. Fraser filed a motion in limine requesting that the court suppress emails allegedly sent from Natalie to Fraser on September 23, 2019; September 24, 2019; September 25, 2019; and March 6, 2020, where Natalie detailed years of abuse by Fraser. Fraser also sought to suppress undated photographs found on Natalie's cell phone showing bruises on her face, which the State claimed corroborated the abuse described in the emails. The trial court conducted hearings on Fraser's motion on May 26, 2023, and July 12, 2023. Then, on July 31, 2023, the trial court entered an order denying Fraser's motion in limine seeking to exclude the emails and photographs.

¶13. In this pretrial order, the court gave three reasons for denying Fraser's motion. First, the court found that Natalie's emails accusing Fraser of years of domestic abuse, and the photographs found on Natalie's phone were probative for a non-character purpose and were not unfairly prejudicial. In support of its decision, the trial court cited *Stone v. State*, 94 So. 3d 1078, 1084 (¶18) (Miss. 2012), where the supreme court stated:

> We find that the trial judge did not abuse his discretion in admitting evidence of Stone's history of threats and violence directed toward his sister "for motive, for opportunity, for his intent, his preparation, his plan and what he was going to do, and knowledge, he's the one that did it for the purpose of his identity and certainly absence of mistake or accident on his part." All relevant evidence is generally admissible, absent an exception. Miss. R. Evid. 402. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. This definition is extremely broad, so that evidence is relevant and should be admitted "if the evidence has any probative value at all." *Adcock v. Miss. Transp. Comm'n*, 981 So. 2d 942, 947 (Miss. 2008) . . . . However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Miss. R. Evid. 403 . . . . Evidence of prior bad acts is inadmissible to prove a defendant's character, though it is admissible for other purposes, as follows:

> [e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Miss. R. Evid. 404(b). To determine whether evidence of prior bad acts is admissible under these rules, we use a two-pronged analysis: "[t]he evidence offered must (1) be relevant to prove a material issue other than the defendant's character; and (2) the probative value of the evidence must outweigh the prejudicial effect . . . [as] required by Mississippi Rule of Evidence 403. . . ." *Welde v. State*, 3 So. 3d 113, 117 (Miss. 2009) (citations omitted). Therefore, the evidence was admissible at trial if it was relevant to a noncharacter issue and its probative value outweighed its prejudicial effect.

The trial court here noted the defense claimed that Natalie's death was accidental and not intentional and that the emails and photos of prior domestic abuse could be used to contradict this defense. In support of this finding, the trial court also cited *Moss v. State*, 727 So. 2d 720, 725 (¶18) (Miss. Ct. App. 1998), where this Court wrote:

> The admissibility of evidence related to prior bad acts is well-established in Mississippi. Mississippi Rule of Evidence 404 provides that evidence of a person's character or a trait of his character is generally not admissible. The rule does, however, designate certain exceptions. Under this rule, evidence of other crimes, wrongs, or acts is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or **absence of mistake or accident**.

(Emphasis added). Secondly, the trial court addressed the defense's contention that the emails and photos were hearsay. The court found that the emails were not hearsay by application of Mississippi Rule of Evidence 801(d)(2)(B) because they were adopted

8

admissions by a party-opponent. Third, the court found that the emails and photographs

satisfied the residual hearsay exception under Mississippi Rule of Evidence 804(b)(5).[3] The

court's pretrial order concluded by stating:

> While the Court finds this evidence more probative than prejudicial, and not
> excluded by another rule, the State must still comply with the governance of
> authentication of evidence as found in Miss. R. Evid. 901 to be finally
> admitted at trial.

¶14.    At trial, the State attempted to introduce the emails between Natalie and Fraser

through Natalie's brother's testimony. Fraser objected to the introduction of the emails on

the basis of hearsay.[4] While the court had previously ruled that the emails could be used to

prove motive, intent, absence of mistake, or lack of accident, the court determined that it was

not proper to introduce the emails through Ryan's testimony at that time. More specifically,

the court stated, "That is the reason that I ruled they would be admissible is to rebut accident

or mistake. [Fraser has] got to make that an issue. And he hasn't yet. That's why I think if

he raises that in his case-in-chief, then I think they're admissible. At this point and time, I

do not think they're admissible."

¶15.    In light of the court's ruling, the State moved on with Ryan's direct examination. The

State asked Ryan if he had any communication with Fraser while Fraser was incarcerated.

Ryan stated that he had received an email from Fraser while he was in jail. At that point,

---

[3] At the time of the trial and during the briefing of this case on appeal, the hearsay residual exception was outlined in Mississippi Rule of Evidence 804(b)(5), and Fraser relies on Rule 804(b)(5) in his argument on appeal. However, the residual exception was moved to Rule 807 effective April 7, 2025.

[4] At trial, Fraser only challenged the admissibility of the emails and photographs as hearsay. Both parties stipulated to their authenticity.

9

defense counsel objected to any questions regarding the alleged jailhouse email. Defense counsel informed the court that the email between Fraser and Ryan had not previously been provided to him through discovery, and counsel knew nothing about any such email correspondence. The State admitted that it had not provided the email to Fraser's attorney and that it had not originally intended on using it at trial. After hearing arguments on the issue of admissibility, the court allowed the email to be admitted into evidence.[5] After Fraser's email to Ryan was admitted into evidence, and because within that email Fraser claimed Natalie's death was an accident, the court then allowed the emails between Natalie and Fraser and the photographs from Natalie's phone to be introduced into evidence pursuant to the court's prior order.

¶16. Our standard of review regarding the admission of evidence was set forth in *Porter v. State*, 418 So. 3d 1287, 1305 (¶54) (Miss. Ct. App. 2025):

> "The standard of review for the admission or exclusion of evidence is abuse of discretion." *Johnson v. State*, 242 So. 3d 145, 153 (¶15) (Miss. Ct. App. 2017). "We give great deference to the discretion of the trial judge, and unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand." *Griffin v. State*, 269 So. 3d 337, 346 (¶24) (Miss. Ct. App. 2018).

¶17. On appeal, Fraser first argues that the emails and undated photographs should have been excluded pursuant to Mississippi Rule of Evidence 404. While evidence of a crime, wrong, or other act is not admissible to prove a person's character, Rule 404(b)(2) provides that "evidence may be admissible for another purpose, such as proving motive, opportunity,

---

[5] Fraser's challenge to the admissibility of Fraser's email to Ryan will be discussed further later in the opinion.

intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." MRE 404(b)(2). In the case at hand, the testimony at trial from several members of law enforcement was that Fraser had stated his finger was on the gun's trigger when Natalie was shot, but the gun only went off when Natalie pulled at his arm. The State contends that Fraser made it known from the beginning that he was going to claim accident as a defense at trial. When the trial court allowed Fraser's email to Ryan to be introduced into evidence, the court held that the email, along with his prior statements to law enforcement, had placed Fraser's accident defense before the jury. As a result the court found the emails and pictures from Natalie's phone were then admissible. We find no abuse of discretion in the court's decision.

¶18.     Fraser also argues on appeal that the emails and photos were too remote to be relevant in this case. However, in *Wooten v. State*, 348 So. 3d 359, 366-67 (¶25) (Miss. Ct. App. 2022), our Court reasoned that even remote occurrences of prior bad acts were admissible. We stated:

> Wooten's arguments are not persuasive. Here, the stabbing occurred thirteen years before Wooten's trial. In *Johnson* [*v. State*], 204 So. 3d 763 [(Miss. 2016)], the first and third offenses occurred thirteen and ten years before the assault at issue. *Id*. at 766-67 (¶8). Remoteness is considered under Rule 403 if the evidence of bad acts is found admissible under Rule 404(b). *May v. State*, 524 So. 2d 957, 965 (Miss. 1988). Here, the trial judge considered the remoteness of John's allegation and still found that even though it occurred thirteen years ago, under *Johnson* it was probative to show Wooten's lack of mistake, lack of accident, or lack of self-defense. She previously had reacted violently during an altercation with a domestic partner and injured him with a deadly weapon. Further, Wooten's claim of self-defense does not preclude the jury from considering that the shooting was an accident or mistake.

In the case at hand, the substance of the emails seeking to be admitted was similar to the

11

evidence discussed in *Moss* and not nearly as remote as the evidence discussed in *Wooten*.

We find no error in the court's ruling that the emails and photographs were admissible under

Mississippi Rules of Evidence 403 and 404(b).

¶19. Secondly, Fraser argues on appeal that the emails and photographs should have been

barred by the rule against hearsay. Rule 807 states in part:

> Under the following conditions, a hearsay statement is not excluded by the rule
> against hearsay even if the statement is not admissible under a hearsay
> exception in Rule 803 or 804;
>
> (1) the statement is supported by sufficient guarantees of trustworthiness –
> after considering the totality of circumstances under which it was made and
> evidence, if any, corroborating the statement; and
>
> (2) it is more probative on the point for which it is offered than any other
> evidence that the proponent can obtain through reasonable efforts.

MRE 807(a). There was no objection to the authenticity of the emails. In fact, the State

called witnesses from both the companies Yahoo and Microsoft to testify as to the source and

dates of the emails in question. Satisfied that the emails were sent by Natalie, in its order

dated July 31, 2023, the trial court held in part:

> [T]he statements made by Mrs. Fraser, who is unavailable due to her death,
> clearly satisfy the residual hearsay rule as found in Miss. R. Evid. 804(b)(5).
> When evaluating the trustworthiness of the statement, courts are to consider
> "whether the statement was written or oral, the character of the statement, the
> relationship between the parties, the motivation of the declarant in making the
> statement, and the circumstance under which the statement was made."
> *Cummins v. State*, 703 So. 2d 869, 874 (Miss. 1987), *overruled on other
> grounds by Morgan v. State*, 703 So. 2d 832 (Miss. 1997) . . . .
>
> As a threshold matter, it is undisputed that Mrs. Fraser is unavailable due to
> death. Additionally, the materiality of the emails cannot be reasonably
> impugned because, as established above, the State seeks to offer her
> allegations of physical abuse to prove Defendant's intent and rebut his claim

12

that the shooting was accidental. Given the secretive nature of Mrs. Fraser's relationship with [the] Defendant, her own emails describing the abuse are more probative of this fact than any evidence the State can obtain from alternative sources. Her own writings, in light of this secrecy, also "bear an increased level of trustworthiness." *See Id.* And the reliability of the physical abuse accusations is further heightened by the fact that Mrs. Fraser made the statements directly to Defendant but evoked no protestation from him. Finally, admitting the emails will serve the interests of justice and the purpose of the Rules of Evidence by helping to ascertain the truth.

¶20. While Fraser argues that Natalie's statements in the emails lacked trustworthiness because of the anger expressed and alleged retaliatory motivation for making the statements, the trial court found the exact opposite. Perhaps the statements were even more reliable because they were made only to Fraser. Natalie was not making the statements for anyone other than Fraser to see. She had no motive or need to convince Fraser of the occurrence of multiple years of alleged abuse—Fraser was there. However, Fraser remained silent regarding Natalie's accusations in his emails. Fraser also argues that Natalie's emails were remote and vague. As discussed above in *Wooten*, 348 So. 3d at 366-67 (¶25), we held that even though the bad act occurred thirteen years prior, it was probative to show lack of mistake. Further, while Natalie had not given specific dates of the abuse, she referenced Fraser attacking her with an iron and chipping her tooth, as well as burning her hair. In this case, and in many abuse cases, the only individuals who are privy to any knowledge of the abuse are the abuser and the victim. Natalie is now dead and unavailable to testify in person. Her statements in the emails are "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." MRE 807(a)(2). We find no abuse of discretion by the trial court in admitting the emails between Natalie and

Fraser and the corresponding photographs under Rule 807 (former Rule 804(b)(5)).

¶21.   Alternatively, Fraser argues that the emails should not have been considered an adopted admission.  Mississippi Rule of Evidence 801(d)(2)(B) allows the introduction of an opposing party's statement if the statement is offered against an opposing party and is a statement that the party manifested and adopted or believed to be true.  The advisory committee notes to Rule 801 state in part that "[s]ilence may constitute a tacit admission if a person would have, under the circumstances, protested the statement made in his presence if the statement were untrue."

¶22.   Fraser relies heavily on *Houston v. State*, 531 So. 2d 598 (Miss. 1988), in arguing that silence to an allegation should not be considered an admission.  However, the facts in *Houston* are distinguishable from the facts in the case at hand.  In *Houston*, Judy Houston was confronted with the allegations of abuse over the phone by her daughter's principal.  *Id*. at 609.  After being confronted with the allegations, Houston hung up the phone.  *Id*.  On appeal the supreme court held:

> Silence, or as here hanging up the telephone, may be motivated by many factors other than a sense of guilt or lack of an exculpatory story.  Admission by silence evidence should be received only where the only reasonable interpretation of the actor's conduct is an admission of the truth of the fact clearly charged.  On this record we have grave doubts whether Houston's hanging up the phone qualifies.  It was error to admit the fact of it.

*Id*. at 609-10.  While Houston hung up the phone and had no response to the allegations, Fraser actually responded to the emails that Natalie sent.  Although Fraser responded with excuses for posting certain derogatory statements on Facebook and accusing Natalie of infidelity in his response emails to Natalie, he never addressed or denied Natalie's allegations

14

of abuse. Because of this distinction, we find no merit in Fraser's argument regarding the admission of the evidence under Mississippi Rule of Evidence 801(d)(2)(B).

¶23. Notwithstanding our conclusion that Fraser's argument regarding the admission of the emails and photographs is without merit, the admission of that evidence would be considered harmless error. In his indictment, Fraser was charged with first-degree murder. Fraser claimed that Natalie's death was accidental and unintentional. The State sought the introduction of the emails between Fraser and Natalie and the photographs of prior domestic abuse for the purpose of contradicting and debunking this defense.

¶24. Before the jurors began their deliberation, they were presented with multiple jury instructions. One such instruction was a "form of the verdict" jury instruction, instructing them that if they unanimously found Fraser not guilty of first-degree murder, then they could then proceed with deliberations to determine whether the State had proved all the elements of second-degree murder. Likewise, the instruction stated that if they unanimously found Fraser not guilty of second-degree murder, then they could proceed with deliberations to determine whether the State had proved all the elements of manslaughter. In essence, to settle on a guilty verdict of manslaughter, the jury would have to unanimously find Fraser not guilty of first-degree and second-degree murder. The jury was also provided an accident instruction, which stated in part that the State had the burden of proving beyond a reasonable doubt that the shooting of Natalie was not an accident. Finally, and more specifically relating to the admission of the emails and photographs, the jury was instructed that while they had heard evidence that Fraser may have committed prior acts of simple assault or domestic

15

violence, any evidence of those other acts was admitted only for a limited purpose. The jury was instructed to only consider that evidence for the purposes of deciding whether Fraser had the state of mind, knowledge, or intent necessary to commit the crime charged in the indictment and further did not commit the acts for which he was on trial by accident or mistake. In *Robinson v. State*, 247 So. 3d 1212, 1233 (¶51) (Miss. 2018), the court noted that "Generally speaking, our law presumes that jurors follow the trial judge's instructions, as upon their oaths they are obliged to do." *Parker v. Jones Cnty. Cmty. Hosp.*, 549 So. 2d 443, 446 (Miss. 1989). Ultimately, after deliberating, the jury found Fraser guilty of culpable negligence manslaughter.

¶25. In defining harmless error, in *Tanner v. State*, 764 So. 2d 385, 399-400 (¶37) (Miss. 2000), the supreme court held:

> Although we agree it was error to admit such testimony, we do not find that the testimony harmed Tanner's defense. At most, the testimony entered was harmless error. In *Thomas v. State*, 711 So. 2d 867, 872 (Miss. 1998), this Court discussed the basic test for harmless error, wherein we stated, 'the inquiry is not whether the jury considered the improper evidence or law at all, but rather, whether the error was unimportant in relation to everything else the jury considered on the issue in question.' In the present case, the error was unimportant in relation to everything else presented. Accordingly, we find this issue to be without merit.

In the case at bar, the evidence of Fraser's prior domestic abuse against Natalie was introduced by the State to support its proof of the indicted charge, first-degree murder, and to rebut a defense of accident relevant to that charge. By following the court's instructions, the jury found Fraser not guilty of first-degree and second-degree murder, but guilty of culpable negligent manslaughter. The evidence was not relevant to the jury's consideration

16

of culpable negligent manslaughter. The proof of that charge, as will be discussed below, came from Fraser's statements prior to trial and at the crime scene itself. Therefore, even if the admission of emails and photographs was error, their introduction was harmless error as evidenced by the jury verdict.

**II.**     **Did the trial court err in its rulings concerning a discovery violation by the State and a discovery violation by the defense?**

¶26.    Fraser contends that the trial court erred by allowing the State to introduce into evidence at trial an email sent by Fraser to Ryan that had not been produced in discovery prior to trial. In contrast, Fraser contends that the trial court erred by excluding a portion of his expert's testimony that had not been disclosed to the State prior to trial.

¶27.    In *Smith v. State*, 373 So. 3d 586, 591-92 (¶¶17-18) (Miss. Ct. App. 2023), this Court detailed the process to be followed when a discovery violation is discovered at trial:

> The procedure to address a discovery violation established by *Box* [*v. State*, 437 So. 2d 19 (Miss. 1983),] and its progeny has been adopted by the Mississippi Rules of Criminal Procedure. Rule 17.9(b) states in part:
>
>> If, during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these Rules and the defense objects to the introduction for that reason, the court shall:
>>
>>> (1) Grant the defense a reasonable opportunity to interview the newly discovered witness and/or examine the newly produced documents, photographs or other evidence.
>>>
>>> (2) If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence, grant a continuance for a period of time reasonably

17

necessary for the defense to meet the non-disclosed evidence, or grant a mistrial.

(3) The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.[6]

We address these issues separately below.

### A.    Did the trial court err in admitting into evidence the email that Fraser sent to Ryan while he was incarcerated?

¶28.    When the State sought to introduce Fraser's email, defense counsel immediately objected because it had not been produced in discovery. The State admitted that it had not provided the email to Fraser's attorney prior to trial and that it had not originally intended on using it at trial. The court gave defense counsel an opportunity to review the email with his client before ruling on the objection. Upon review of the email, the court determined, "It is a discovery violation. The defendant is entitled to all statements, inculpatory or exculpatory, that he is alleged to have made. . . . So, it is a discovery violation." The issue at that point was to decide how to proceed in light of the State's discovery violation. Fraser's attorney responded, "I'm not asking for a mistrial. I'm just asking to move on." The court asked Fraser's counsel if he needed a "delay." The defense attorney did not ask for a delay, continuance, or mistrial but was given another opportunity to confer with his client. Fraser's counsel then argued again that the email should not be allowed to come in and that the email would have impacted their defense had it been previously disclosed in discovery. In

---

[6] Rule 17.9(a) also states that "[t]he court shall follow the same procedure for violation of discovery by the defense." MRCrP 17.9(a).

18

response, the State argued that at the beginning of trial, Fraser's counsel argued that their defense was going to be that the shooting was an accident, and the defense even submitted a proposed jury instruction regarding accident. The State further argued that other witnesses had already testified regarding Fraser's statements on the day of the incident claiming that Natalie's death was an accident. The State claimed that the email from Fraser was merely further evidence that Fraser was claiming accident as a defense. At that point, rather than requesting a continuance, Fraser's counsel stated:

> If their argument is that this is consistent with what's already been put into evidence, and your ruling was already that I had not put it on in my case-in-chief, therefore this should not come in. Why can't we meet in the middle, allow this to come in, and not allow the e-mails and the photos that we have been arguing about since – it might have been a year now, I think.
>
> BY THE COURT: No, that's not – yeah, I understand. No. That's not how that works. I think there is – with that, I think there is sufficient evidence for those e-mails to come in. And the Court's concern about the whole thing is, that when they knew about it in April, they should have given it to you quite honestly. That's the Court's concern. Not that it's not admissible, because I believe it is. And I do believe that it now makes accident an issue. And then there is now an accident instruction that will be given. And it becomes a jury issue at this point.

Fraser's counsel made no additional argument other than requesting that some parts of the email between Ryan and Fraser be redacted. The parties agreed to the redactions sought by the defense. The procedure outlined in Rule 17.9 was followed by the trial court, and we find no reversible error by the trial court in admitting Fraser's email to Ryan into evidence.

**B.**     **Did the trial court err in limiting Fraser's expert witness's testimony at trial?**

¶29.    On April 24, 2023, Fraser filed a "Motion for Funds to Hire Defense Expert in

Firearms." An order granting funds was entered on May 16, 2023.[7] Pursuant to the order, Fraser retained Jeff Goudeau as an expert in the field of firearms examination and analysis. Goudeau testified that he and Michael Shain, the State's firearm expert, examined and tested the gun that was used to kill Natalie. According to Goudeau, he, Shain, and an investigator with the district attorney's office met at Goudeau's office to do all the firearm testing together. According to the record, this testing occurred on June 23, 2023. Goudeau apparently generated a report explaining the conclusions he reached from the testing; however, his report was not disclosed to the State until the night before the fourth day of trial, on August 30, 2023. The report was not introduced into evidence and is not contained in the record on appeal; thus, the date of the report and the exact content of the report is uncertain.[8] By the time that Goudeau took the stand at trial, the State's firearms expert had already testified regarding the functionality of the gun. Further, the State's forensic pathologist, Dr. Frank Peretti, had already testified and had been released by the State. In his testimony, Dr. Peretti stated that Natalie's gunshot wound was more consistent with a distant gunshot wound, which he defined as one being fired from at least two feet away.

¶30. Goudeau's and Shain's opinions were consistent in that they both agreed that there were no defects with any of the gun's safeties, and there were no mechanical problems with

---

[7] Neither the motion nor the order granting funds to hire a firearms expert are included in the record on appeal.

[8] It was the appellant's responsibility to make sure the report was included in the record on appeal when he is arguing that testimony consistent with the report was wrongfully excluded. *See Jones v. Jones*, 307 So. 3d 1229, 1230-31 (¶¶3-8) (Miss. Ct. App. 2020); *Henderson v. State*, 783 So. 2d 769, 771 (¶¶4-5) (Miss. Ct. App. 2000).

the firearm. An issue arose when the defense sought to have Goudeau testify concerning his opinion as to the distance from which the fatal bullet was shot in response to Dr. Peretti's testimony. The State objected that Goudeau was not qualified to render such an opinion and that the defense had not timely disclosed that Goudeau would be offering expert testimony on this issue. The trial court excused the jury, and heard arguments from both sides, and received Goudeau's proffered testimony.

¶31. Fraser's counsel advised the court that Goudeau's report stated Natalie's gunshot wound was more consistent of being intermediate rather than close range. Further, Goudeau testified, outside of the presence of the jury, that Peretti's determination regarding distance did not take into account intermediate objects, such as her shirt or her hair. Therefore according to Goudeau, Peretti's statement about the gunshot wound being consistent with a distant gunshot wound was misleading and may not be accurate. However, Goudeau, in his proffered testimony, did not offer an opinion as to the distance from which the fatal bullet was shot. Further, Goudeau did not define or give any parameters on what he believed to be an "intermediate" range.

¶32. Once it was discovered that Goudeau's report had, in fact, documented his opinion regarding the distance of the gunshot, the State renewed its objection on the ground that Goudeau's report had not been timely produced in compliance with Mississippi Rule of Criminal Procedure 17.3(3). In *Mohamed v. State*, 323 So. 3d 532, 541 (¶¶17, 27) (Miss. Ct. App. 2021), this Court stated:

> We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Webb v. Braswell*, 930 So. 2d 387, 396-97 (¶15) (Miss.

21

2006); *Triplett v. River Region Med. Corp.*, 50 So. 3d 1032, 1039 (¶30) (Miss. Ct. App. 2010). "We will not reverse the trial court's decision to admit expert testimony unless it was arbitrary and clearly erroneous, amounting to an abuse of discretion." *Garner ex rel. Garner v. State*, 247 So. 3d 345, 350 (¶14) (Miss. Ct. App. 2018) (internal quotation marks omitted).

. . . .

This Court applies an abuse of discretion standard to its review of a circuit court's decisions "regarding matters of evidence, relevancy and discovery violations." *Turner* [*v. State*], 292 So. 3d [1006,] 1020 (¶38) [(Miss. Ct. App. 2020)] (quoting *Montgomery v. State*, 891 So. 2d 179, 182 (¶6) (Miss. 2004)). **In so doing, "[t]his Court must determine '(1) whether such a violation occurred [and,] if so, (2) whether the exclusion of this evidence was an appropriate remedy.'"** *Id*. (quoting *Myers* [*v. State*], 145 So. 3d [1143,] 1147 (¶10)) [(Miss. 2014)].

(Emphasis added).

¶33.     Mississippi Rule of Criminal Procedure 17.3(3) requires the disclosure of "[a]ny reports, statements, or opinions of experts which the defendant may offer in evidence." The defense did not disclose Goudeau's report until the night before the fourth day of trial. The State's experts had testified and had been released. Clearly the late disclosure of Goudeau's report severely affected the State's ability to prepare for rebuttal evidence.

¶34.     In any event, Goudeau's testimony, at best, would have only suggested that Peretti's testimony concerning the distance from which the fatal shot was fired *may* be wrong. A version of events where Natalie pulled the gun toward her head or knocked Fraser's hand while his finger was on the trigger is not excluded by Peretti's testimony. Therefore, the exclusion of Goudeau's proffered testimony that the gun was fired at an "intermediate range" was harmless at best.

**III.     Was the evidence sufficient for a manslaughter conviction?**

22

¶35. The title of the issue raised by Fraser on appeal seems to challenge both the legal sufficiency of the evidence and whether the verdict was against the overwhelming weight of the evidence. However, in his brief on appeal, Fraser only argues that the evidence was legally insufficient to support his conviction and that his conviction should be reversed and rendered. Accordingly, we will address his sufficiency of the evidence claim, but not the issue of the weight of the evidence, which he failed to argue or address by citing relevant authorities.[9]

¶36. Concerning our standard of review of the sufficiency of the evidence, this Court stated in *Jones v. State*, 380 So. 3d 974, 980-81 (¶¶13-14) (Miss. Ct. App. 2024):

> We review a challenge to "the legal sufficiency of the evidence" de novo, but the evidence must be "viewed in a light most favorable to the State." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). This means that "all credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Id*. "We determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Williams v. State*, 285 So. 3d 156, 159 (¶11) (Miss. 2019). "We are not required to decide — and in fact we must refrain from deciding — whether we think the State proved the elements." *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010). Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all the elements of the offense. *Id*.

¶37. Fraser claims that his version of events during the early morning of December 30, 2021, was reasonable and was never contradicted by any reliable witness from the State's case-in-chief. As such, Fraser claims that, pursuant to *Weathersby v. State*, 165 Miss. 207, 147 So. 481, 482 (1933), the trial court should have granted his motion for a directed verdict.

---

[9] *See Carpenter v. State*, 400 So. 3d 493, 501 (¶26) & n.7 (Miss. Ct. App. 2024).

23

In *Childress v. State*, 395 So. 3d 1243, 1247 (¶27) (Miss. 2024), the supreme court repeated the rule from that case as follows:

> Under the *Weathersby* rule:
>
> Where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.

However, there are exceptions to the rule. In *Barfield v. State*, 22 So. 3d 1175, 1185 (¶33) (Miss. 2009), the supreme court noted:

> However, this Court has provided some guidance for circumstances in which the *Weathersby* Rule would be inapplicable where a defendant was the only eyewitness to a homicide. *See Johnson v. State*, 987 So. 2d 420, 425 (Miss. 2008). "[I]f the defendant or the defendant's eyewitnesses' testimony satisfies all the elements of murder or manslaughter, the defendant would not be entitled to a directed verdict of acquittal, as their testimony would be the basis for a valid conviction." *Id*. In addition, the *Weathersby* Rule is inapplicable where: (1) "the defendant's version is patently unreasonable, or contradicted by physical facts"; (2) **"where the accused, following the slaying, gives conflicting versions of how the killing took place";** and (3) where the accused "initially denies the act." *Id*. (quoting *Blanks v. State*, 547 So. 2d 29, 33-34 (Miss. 1989)). When a defendant is the sole eyewitness to the killing and the *Weathersby* Rule does not apply, the question "then becomes a jury issue as to whether to believe or not believe the defendant's testimony of how the slaying occurred, and to either convict or acquit." *Id*. (quoting *Blanks*, 547 So. 2d at 33-34).

(Emphasis added); *see also Whiddon v. State*, 398 So. 3d 896, 919-20 (¶83) (Miss. Ct. App. 2024).

¶38.    Here, Fraser's own pretrial statements were inconsistent. Testimony of Fraser's first version of events came from Manion and Ryan, who both received text messages from Fraser on the morning of December 30, 2021. Manion testified that he had received a text from

Fraser stating that Natalie was dead. More specifically, the text message stated that Natalie pulled the gun to her head. The text message said that Natalie and Fraser were "f***ing around" with the gun and that Fraser was drunk. Manion testified that after reading the text messages from Fraser and speaking with him on the phone, it was his belief that Natalie had committed suicide and that Fraser was contemplating doing the same. The second version of events came from Ryan, who also had received a phone call from Fraser on the morning of December 30, 2021. Ryan testified that, when he answered a call from Natalie's cell phone, Fraser told him that Natalie had shot herself. Both Manion and Ryan believed that Natalie had committed suicide based on their conversations with Fraser. Fraser never indicated to them that he was the one holding the gun when it discharged.

¶39. When law enforcement began arriving at Fraser's home, Fraser's story took a different turn. Deputy Griffin testified that Fraser told him that he was the one holding the gun when it went off. Fraser also told Griffin that he and Natalie were not fighting that night but, rather, playing around with the gun. Captain Nabors testified Fraser told him that he was holding the gun when it discharged and that he pulled the trigger. Detective Glasgow testified that Fraser admitted to him that he had the gun when Natalie reached up and pulled the gun to her neck. According to Glasgow, Fraser stated that his finger was on the trigger. Finally, in Fraser's email to Ryan after he was incarcerated, Fraser stated, "I [was] going to put the gun back in the drawer, she turns, I turn, both bumped into each other and – what happened was instant!" Fraser also admitted in his email that both he and Natalie were drinking before they pulled out the gun. Because Fraser's pretrial statements were

inconsistent, he is not entitled to any relief pursuant to *Weathersby*.

¶40.     The jury heard all the evidence at trial and was given instructions regarding first-degree murder, second-degree murder, and manslaughter.  The jury was also instructed on the definition of culpable negligence as "negligence of a degree so gross as to be tantamount to wanton disregard of, or utter indifference to, the safety of human life."  Given Fraser's own statements that he and Natalie were playing around with a loaded gun while they had both been drinking, the case at hand falls in line with similar cases where convictions for culpable negligence manslaughter were upheld.  *See Tait v. State*, 669 So. 2d 85, 89-90 (Miss. 1996) (eyewitness testimony that there was horseplay, the gun went off, and the defendant fell to the ground crying; there was no testimony indicating that the gun was the defendant's, that he knew it was loaded, or that he pulled the trigger); *Strode v. State*, 406 So. 2d 820, 821-22 (Miss.1981) (testimony by defendant that he was horsing around with the gun, that he did not know it was loaded, and that the gun slipped and went off as he tried to catch it); *Jernigan v. State*, 305 So. 2d 353, 354 (Miss.1974) (testimony by defendant that he pulled the gun out of his shirt, it discharged by accident, he did not think the gun was loaded, and he and the victim "pranked" each other in this manner frequently); *Johnson v. State*, 997 So. 2d 256,  260 (¶11) (Miss. Ct. App. 2008) (testimony by defendant that the gun fired even though his finger was barely on the trigger and that he never meant to kill anyone).  Therefore, we find that the evidence presented at trial was sufficient to support Fraser's conviction.

**CONCLUSION**

26

¶41. After reviewing the record, we find no error by the trial court in allowing the emails and photographs to be introduced at trial. Further, we find no error by the trial court in limiting the testimony of Fraser's expert witness. Finally, we find that the evidence was sufficient to support Fraser's conviction. Therefore, Fraser's conviction and sentence for culpable negligence manslaughter are affirmed.

¶42. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**